**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Freddie L. CANNINGTON, J. Buddy Raez a/k/a Buddy Hand a/k/a Buddy Cannington, Defendants-Appellants.**

**No. 82–7250.**

United States Court of Appeals,
Eleventh Circuit.

April 9, 1984.

Edward R. Shohat, Benedict P. Kuehne, Miami, Fla., for F. Cannington.

Frank Petrella, Atlanta, Ga., for Raez.

Gloria C. Phares, Appellate Section, Crim. Div., Dept. of Justice, Washington, D.C., for the U.S.

Before FAY and HENDERSON, Circuit Judges, and BOYLE *, District Judge.

FAY, Circuit Judge:

Following a jury trial in the United States District Court for the Southern District of Alabama, appellants Freddie Cannington and Rollie Stankowitz were convicted of conspiracy to import marijuana, in violation of 21 U.S.C. § 963 (1980); importation of marijuana, in violation of 21 U.S.C. § 952(a) (1980); and conspiracy to distribute and to possess marijuana with intent to distribute, in violation of 21 U.S.C. § 846 (1980). In addition, Stankowitz [1] was convicted of distribution of and possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1).[2] The appellants each received a consecutive sentence.[3] On appeal, Cannington and Stankowitz challenge the sufficiency of the evidence adduced at trial and allege numerous errors in the conduct of their joint trial.[4] Finding no merit in any of appellants' contentions, we affirm.

## I. THE VOYAGE OF THE STACEY LAMAR

The evidence presented at trial showed that a group of shrimpers in the coastal

---

* Honorable Edward J. Boyle, Sr., U.S. District Judge for the Eastern District of Louisiana, sitting by designation.

1. Throughout the planning stage of the conspiracy, appellant Stankowitz variously presented himself as "J. Buddy Raez," "Buddy Hand" and "Buddy Cannington." As appellant states that his legal name is Rollie L. Stankowitz, we will refer to him as "Stankowitz."

2. The statutes involved in this case are sections of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. No. 91–513, 84 Stat. 1236 ("Drug Control Act"). Title III of this Act (Subchapter II of Chapter 13 of 21 U.S.C.) (entitled "Importation and Exportation") relates to imports and exports of controlled substances. Among its provisions is 21 U.S.C. § 952, which defines and proscribes the act of unlawful importation. Title III of the Act (Subchapter I of Chapter 13 of 21 U.S.C.) (entitled "Control and Enforcement") relates to internal prevention and control of drug abuse. Among its provisions is 21 U.S.C. § 841, which makes it unlawful to distribute and to possess with an intent to distribute controlled substances domestically. Each title of the Act contains its own, identically worded provision prohibiting conspiracy to commit any of the offenses described in that title:

 Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

21 U.S.C. §§ 846, 963. Thus, § 963 punishes conspiracy to import marijuana and § 846 punishes conspiracy to distribute and to possess with intent to distribute marijuana domestically.

The appellants were each charged in a four-count indictment. Count I charged distribution and possession with intent to distribute marijuana under § 841(a)(1); Count II charged conspiracy to distribute and to possess with intent to distribute marijuana under § 846; Count III charged importation of marijuana under § 952(a); and Count IV charged conspiracy to import marijuana in violation of § 963. Each was convicted by the jury on Counts II, III and IV. Stankowitz was also convicted on Count I, and Cannington was acquitted as to this charge.

3. Cannington received three consecutive five-year terms of imprisonment and was fined a total of $50,000. Stankowitz received four consecutive three-year-and-nine-month terms of imprisonment, was fined $50,000, and additionally was sentenced to two concurrent special parole terms.

4. Appellants were tried together with co-conspirators Robert F. Stewart and Roland Howell, who were indicted separately in an indictment charging the same four offenses charged against appellants. Howell was acquitted on all counts. Stewart was convicted on Count II and sentenced to twelve years' imprisonment. He was acquitted on the other counts. Stewart's appeal was dismissed on his own motion on June 1, 1983.

town of Bon Secour, (Baldwin County), Alabama conspired with other Baldwin County citizens and appellants to import and distribute marijuana. The appellants' central role in the enterprise was to provide financial backing and a source of marijuana.[5] The scheme began in early 1981, when Bon Secour residents James Parker and Gene Mayson approached Sam Styron, a town resident, told him that they had a boat available and asked Styron whether he knew of anyone who could arrange for a load of marijuana to be transported from Colombia. Styron in turn discussed the proposition with Cannington, who was passing through Foley, Alabama en route from Florida to Alaska.

The upshot of these early discussions was a meeting in late January or early February, 1981, attended by Cannington, Styron, Parker, Bob Taylor, and Terry Farmer at the Bon Secour fire station. During the meeting, a "deal" was agreed upon. The conspirators discussed the general organization of the scheme and the size and schedule of the shipment. They planned for the boat to depart in four to five weeks, and they estimated that it could hold 20,000–30,000 pounds of marijuana. They agreed that Farmer and Taylor would provide the boat, the "STACEY LAMAR," and would arrange for a crew. Styron and Parker were responsible for unloading the boat and storing the marijuana.[6] Because he had contacts in Colombia, Cannington was charged with arranging for the buy at the Colombian end, for loading the boat in Colombia, and for disposing of the marijuana following its storage in this country. In addition, Cannington and Stankowitz were to be the financial backers for the entire project.

Final payment to the co-conspirators would be made later from the proceeds of the marijuana sales. It was agreed that Farmer and Taylor would receive $600,000 from which they would pay the crew. Styron expected to receive $500,000 from which he was to pay Parker and Mayson $50,000 each.

During the planning stages for the voyage (February and March, 1981), Cannington was registered at the Holiday Inn in Gulf Shores, Alabama. Stankowitz was registered first briefly at the Gulf Shores Holiday Inn and then at the Passport Inn, located several blocks from the Holiday Inn.[7] Both Cannington and Stankowitz attended numerous meetings of the conspirators, during which the conspirators planned more particularly the boat's destination, purpose and departure date. Farmer and Taylor also discussed how much front money would be provided to outfit the boat. They ultimately received $20,000 from Cannington.

At a later meeting, the conspirators enlisted co-defendants Robert Stewart and Roland Howell, Baldwin County deputy sheriffs, to provide "protection," i.e., to warn the conspirators of law enforcement surveillance of their operation. Cannington originally agreed to pay $75,000 for this protection, but later promised a bonus of $150,000 because of the high quality of the "intelligence." Five of the conspirators later contributed $1,000 each as front money for "security" purposes.

The "STACEY LAMAR," with her name changed to "CIPOLO GAL," left for Colombia about March 1, 1981. When the Colombians still had not made radio contact with the boat two days after its scheduled arrival,[8] Cannington, Stankowitz, Farmer

---

5. The evidence at trial consisted primarily of the testimony of six of the co-conspirators in the marijuana importation and distribution scheme, all of whom had pleaded guilty.

6. To this end, Styron bought a piece of land with a barn on it adjacent to nearby Weeks Bay.

7. The registration records at the Holiday Inn show the name "Ray Hand" and those at the Passport Inn show the name "Buddy Hand, Jr."

The address on both registration cards is 740 West 74th Street, Anchorage, Alaska. This is the same address that appears on the driver's license carried by Stankowitz at the time of his arrest.

8. Cannington knew that there had been no contact with the boat through "Al," a Miamian, who telephoned the Colombians regularly.

and Taylor, with Cannington as pilot of a private plane, flew to Miami. The next day they took the plane up to 10,000 feet, where they radioed the boat and learned that it was safe. When the plane landed again in Miami, Cannington's contact, "Al," phoned the Colombians who reported that they were still unable to contact the boat. The three then took the plane up again, contacted the boat, and told the boat to stand by offshore until the three arrived with another radio.

While in Miami, Cannington bought Farmer an airline ticket to Barranquilla, Colombia. Cannington and Taylor then flew back to Gulf Shores, Alabama. The plane's return to the airport in Gulf Shores on March 13, 1981 was observed by United States Customs Agent Michael Ciaurro, who had been alerted to suspected drug trafficking by a deputy sheriff who had observed the plane's departure. Cannington and Stankowitz then proceeded to the Passport Inn, where Stankowitz was then registered.

The observation of the plane by the law enforcement officer provoked an emergency meeting of the conspirators. Several of the participants, including Cannington and Stankowitz, met behind a "Junior's" Food Store located just on the Florida side of the Florida-Alabama border. Because the police had a description of appellants' car, the conspirators used a radio scanner en route to the meeting to monitor the police frequencies and elude detection. At the meeting, Stewart and Howell reported that the police suspected the plane's occupants of drug trafficking. The conspirators considered calling off the deal, but decided to proceed in accordance with Stewart's advice that Cannington and Stankowitz should buy a radio scanner with DEA and Mississippi law enforcement frequencies and subsequently move their location to Mississippi to divert the attention of the law enforcement officers from Baldwin County.

Following the meeting behind "Junior's," Cannington and Stankowitz checked out of their hotels in Gulf Shores and registered in separate hotels in Biloxi, Mississippi. Cannington and Stankowitz met often during their stay in Biloxi, and they both checked out of their hotels in the middle of the night shortly before the delivery of the marijuana.

In the meantime, Farmer had travelled to Barranquilla, taking with him a radio for contacting the "STACEY LAMAR." He made contact with two Colombians, one of whom was named Eduardo. Upon his arrival, Farmer straightened out the radio equipment, contacted the "STACEY LAMAR" and provided directions for loading the marijuana. From a house where the marijuana was stored, Farmer observed as a dozen small boats ferried the marijuana to the "STACEY LAMAR." The next day Farmer flew to New Orleans and was met by Taylor.

Farmer and Taylor drove to Biloxi where they rendezvoused with Cannington. Cannington explained that the Biloxi move was intended to divert police attention. At this meeting, Farmer related a conversation which he had had in Colombia with the conspirator referred to as "Eduardo." Eduardo had advised Farmer that Cannington should sell the marijuana because Cannington always sold it in large quantities, thus enabling the conspirators to receive their money quickly. Farmer also relayed Eduardo's directive that Cannington should not let "Buddy" (Stankowitz) have the marijuana, because "Buddy" sold it in smaller amounts and did not get as high a price. Cannington's response to Farmer was that he could not do much about the situation, because "Buddy" was "backing the deal." Cannington stated that because it was "Buddy's" money which was being used, "the money was his too."

The "STACEY LAMAR" made its way back into Mobile Bay in the early hours of March 31, 1981. Because of fog, its destination was diverted to adjacent Weeks Bay where it was met by four men in skiffs who began unloading the bales of marijuana and ferrying the bales to shore. Because they were running late, the unloading was not concluded before daybreak.

Responding to a report from private citizens that marijuana was being loaded onto a truck in the Weeks Bay area, a Baldwin County sheriff drove to Weeks Bay. Along the way, the sheriff encountered a truck matching the description given and stopped it. The truck was driven by Styron's brother, Calvert Styron, who consented to its inspection. Several bales of marijuana were found inside the truck, and Calvert Styron was arrested.

The captain of the "STACEY LAMAR," hearing by radio that the truck "had been busted," weighed anchor and headed toward the mouth of Mobile Bay until the boat went aground. The captain and his crew then jumped into the water, using a remaining bale of marijuana as a life raft. The captain left the boat running and paddled out into the bay. He was picked up by the Corps of Engineers and later arrested by the Coast Guard. The entire shipment of marijuana ultimately seized from the "STACEY LAMAR" weighed 29,060 pounds.

## II. SUFFICIENCY OF THE EVIDENCE [9]

Appellant Cannington contends that the evidence was insufficient to support his conviction on Count II for conspiring to possess with intent to distribute and distributing marijuana. Appellant Stankowitz challenges the sufficiency of the evidence supporting his conviction on each of the four counts. Upon a thorough review of the record as to each appellant, we find that the evidence was sufficient to convict Cannington and Stankowitz on each challenged count.

### A. *Cannington*

■ Cannington concedes that the evidence was sufficient to support his convictions for conspiring to import and importing marijuana. He maintains, however, that the only evidence which demonstrates his participation in a conspiracy to distribute is his presence and association with others who were involved in planning marijuana distribution. Contrary to Cannington's assertions, we find the record replete with evidence of Cannington's direct participation in the distribution conspiracy.[10]

The conspiracy to distribute is evidenced by the conspirators' acknowledgement that they would not receive their money until after the marijuana was sold. Cannington's role in the organization was to arrange for buying and loading the marijuana and for its sale after it was stored. Furthermore, if Cannington put up the "front money" for the purchase of the marijuana, the outfitting of the STACEY LAMAR, and financed Farmer's trip to Colombia to restore radio communication with the boat, the jury could easily infer that he expected to recoup his investment from the marijuana's sale in the United States.

Cannington further implicated himself in the distribution scheme through his response to Eduardo's message. Upon hearing that "Eduardo" had urged that Cannington, rather than "Buddy," control the distribution, Cannington did not deny distribution plan. To the contrary, his explanation that "Buddy," not he, was controlling the distribution is a clear admission of his participation in and knowledge of the conspiracy to distribute.

**9.** In reviewing the sufficiency of the evidence, we *must view all of the evidence, direct and circumstantial, in the light most favorable to the government. Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The critical inquiry is whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (Unit B, *en banc*), *aff'd on other grounds,* —— U.S. ——, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

**10.** Because of the abundance of evidence which directly links Cannington with the distribution scheme, we need not address the troublesome question as to whether sufficient evidence of involvement in an importation scheme is alone sufficient to also support a conviction for conspiracy to distribute. *See e.g., United States v. Russell,* 703 F.2d 1243, 1249 (11th Cir.1983); *United States v. Cuni,* 689 F.2d 1353, 1356 (11th Cir.1982); *United States v. Bulman,* 667 F.2d 1374, 1378–79 (11th Cir.), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982); *United States v. Michelena-Orovio,* 719 F.2d 738 (5th Cir.1983) (*en banc*). *Contra United States v. Cadena,* 585 F.2d 1252 (5th Cir.1978).

### B. *Stankowitz*

■ Stankowitz challenges the sufficiency of the evidence supporting his convictions on both counts of conspiracy and on both substantive offenses. The thrust of his argument is that while he may have associated with the co-conspirators, there was no evidence presented that he joined the conspiracy. Stankowitz's argument ignores the factual record.

■ During the time of the charged conspiracies, Stankowitz was not a resident of Baldwin County, Alabama, but was living in motels in Gulf Shores and Biloxi. From this the jury could infer that he had some particular reason to be in the area. He attended the meetings of the co-conspirators, including the emergency meeting to discuss police surveillance and whether to continue with the operation. Although association alone will not support an inference of conspiracy, association with co-conspirators may be considered as a factor. *United States v. Cole*, 704 F.2d 554, 557 (11th Cir.1983).

■ Stankowitz's activities were not, however, limited to simple association. On two occasions, he offered to serve or actually served as a decoy to divert the attention of the police. When appellants and the other co-conspirators realized that the deputy sheriff was surveilling them at the airport, Stankowitz offered to take the sheriff on a "wild goose chase." Stankowitz and Cannington subsequently complied with the suggestion that they move their base of operations to divert police attention from Baldwin County. This ploy was intended to and did further the conspiracy to import by helping it to escape detection. This was certainly sufficient evidence to support Stankowitz's conviction for the conspiracy to import (Count IV).[11]

The same evidence supporting appellant Cannington's conviction of conspiracy to distribute also supports Stankowitz's conviction for the same offense (Count II). The distribution plan called for final payoff from the proceeds of the marijuana's sale in which Stankowitz too would have shared. Reinforcing that conclusion is Cannington's statement that he could not control the distribution because "Buddy" had put up the money and therefore controlled its resale.

Stankowitz's role as the ultimate financial backer is also enough to support his substantive distribution conviction (Count I). The jury could rely upon Farmer's testimony that "Buddy" had put up the money to conclude that he had aided and abetted the possession of the marijuana for its ultimate distribution. Since Cannington's assigned role was to take the marijuana after it was stored, the jury could have concluded that Stankowitz's position as banker made him the "mastermind" of the operation, who aided and abetted the distribution through Cannington, with Cannington serving as Stankowitz's lieutenant. *See Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949); *United States v. Raffone*, 693 F.2d 1343, 1346 (11th Cir.1982), *cert. denied*, — U.S. —, 103 S.Ct. 2094, 77 L.Ed.2d 303 (1983). Alternatively, the same evidence could support the conclusion that Stankowitz, operating through *his* "lieutenant", had constructively possessed the marijuana.[12] *United States v. Raffone*, 693 F.2d at 1346; *United States v. Gloria*, 494 F.2d 477, 482 (5th Cir.), *cert. denied*, 419 U.S. 995, 95 S.Ct. 306, 42 L.Ed.2d 267 (1974).

### III. JOINDER AND MOTIONS FOR SEVERANCE

Appellants maintain that they were wrongfully and prejudicially joined for trial

---

**11.** The evidence was also sufficient to support the substantive importation conviction (Count III). The indictment charged violations of 18 U.S.C. § 2 (1980), the aider and abettor provision, in both substantive counts, and the jury was properly instructed on aiding and abetting (*See* R.Vol. 10 at 1692–98, 1708). The same evidence can be used to prove both conspiracy

and the aiding and abetting of a substantive offense. *United States v. Pearson*, 655 F.2d 569, 570 (5th Cir., Unit B 1981); *United States v. Cowart*, 595 F.2d 1023, 1034–35 (5th Cir.1979).

**12.** The jury was instructed on constructive possession. *See* R.Vol. 10 at 1695–97.

under Fed.R.Crim.P. 13 [13] with co-conspirators Stewart and Howell, the deputy sheriffs who relayed information concerning law enforcement surveillance to the conspirators. They also allege that the trial court abused its discretion in denying their motions for severance under Fed.R.Crim.P. 14.[14] Cannington and Stankowitz contend in particular that joinder with the deputy sheriffs required the admission of testimony concerning the bribery of public officials and that the damaging effect of this prejudicial testimony spilled over to unnecessarily prejudice the jury against appellants.

It is well settled that joinder under Rule 13 is proper where the conspiracies and substantive offenses enumerated in the indictments at issue grew out of the same series of acts and transactions and thus could have been joined originally in a single indictment. *Gomez v. United States*, 245 F.2d 344, 345–46 (5th Cir.), *cert. denied*, 355 U.S. 863, 78 S.Ct. 95, 2 L.Ed.2d 68 (1957).[15] Further, in deciding whether to permit joinder of defendants, the trial court must accept the factual allegations of the indictment as true. *United States v. Zicree*, 605 F.2d 1381, 1387 (5th Cir.1979), *cert. denied*, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980). Because the allegations of the indictments which implicated the conspirators here, taken as true, establish conspiratorial conduct arising from the same series of acts and transactions, there is no inherent prejudice to the defendants and joinder was proper under Rule 13.

Once defendants have been joined, severance is then a matter of trial court discretion under Rule 14. Denial of a motion for severance is reversible only for an abuse of discretion and a showing of compelling prejudice must be made before a trial court's ruling will constitute an abuse of discretion. *United States v. O'Malley*, 707 F.2d 1240, 1250 (11th Cir. 1983); *United States v. Capo*, 693 F.2d 1330, 1335 (11th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 1793, 76 L.Ed.2d 359 (1983), panel opinion reinstated *en banc*, 716 F.2d 1355, 1356 (11th Cir.1983). Appellants have simply not borne their burden of establishing compelling prejudice in this instance, and we find that there was no abuse of discretion in denying the motion to sever.

In considering this issue, we are satisfied that the jury was able to "individualize each defendant in his relation to the mass," *Kotteakos v. United States*, 328 U.S. 750, 773, 66 S.Ct. 1239, 1257, 90 L.Ed. 1557 (1946), *i.e.*, that the jury was able to avoid cumulating the evidence against all of the defendants to make individual guilt determinations. The trial, which lasted seven days, was not unduly complicated, and was in fact a far less burdensome prosecution than many conspiracy trials. There were only four defendants, each of whom was charged on the same four counts. The principal witnesses were the six co-conspirators who told essentially the same story. Only three witnesses who testified particularly as to the participation of the law enforcement officers gave testimony that was peripheral to appellant's involvement in the conspiracy. Furthermore the trial court specifically instructed the jury to consider only the evidence against each defendant relating to him individually. That the jury followed that directive is evidenced by the acquittal of Cannington on Count I,

---

**13.** Fed.R.Crim.P. 13 provides:

The court may order two or more indictments or informations or both to be tried together if the offenses, and the defendants if there is more than one, could have been joined in a single indictment or information. The procedure shall be the same as if the prosecution were under such single indictment or information.

**14.** Fed.R.Crim.P. 14 provides in pertinent part:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

**15.** Decisions of the Fifth Circuit rendered prior to October 1, 1981, are binding precedent on this Court unless and until overruled or modified by this Court *en banc. Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*).

of Stewart on three of the four counts, and of Howell as to all counts.

## IV. CO–CONSPIRATOR'S STATE-MENTS

Appellants claim that the trial court erred in admitting, through Farmer's testimony, the statements made by "Eduardo" which directed that Cannington, rather than Stankowitz, dispose of the marijuana. The court admitted the statements under the co-conspirator exception to the hearsay rule articulated in Fed.R.Evid. 801(d)(2)(E).[16] Cannington and Stankowitz argue that the testimony should not have been admitted because the prosecution failed to independently establish their involvement in the conspiracy.

 In order to admit the statements of a co-conspirator, the trial court is required to determine if evidence independent of the hearsay statements shows that a conspiracy did exist, that the persons challenging the admission were members of the conspiracy and that the statements were made during the course of and in furtherance of the conspiracy. *United States v. James*, 590 F.2d 575 (5th Cir.) (*en banc*), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). We find that the record contains ample evidence to support the trial court's decision to admit the statements made by "Eduardo." The trial court is given wide latitude under *James* in admitting such statements, and the court properly carried out its obligation in this instance.[17]

## V. THE IN–COURT IDENTIFICATION

 Prior to trial, Stankowitz moved to suppress his in-court identification because the witnesses who would identify him had been improperly influenced by the suggestive display of a single photograph. At a pre-trial hearing, the district court found that a display of Stankowitz's photograph in a single-photo identification procedure to three witnesses had been impermissibly suggestive. Nevertheless, it held that the photo display did not create a substantial likelihood of improper in-court identification because each of the witnesses to whom the photograph had been shown had had a substantial independent basis for making the identification. We agree with the district court's finding, and find that the motion to suppress was properly denied.

 An in-court identification, even if preceded by a suggestive out-of-court identification procedure, is nevertheless admissible if the in-court identification has an independent source. *United States v. Wade*, 388 U.S. 218, 241, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967). Among the indicia of a sufficient, independent basis for identification are the witness's opportunity to observe the defendant at the time of the offense, the witness's degree of attention, the degree of certainty shown at the confrontation, and the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–383, 34 L.Ed.2d 401 (1972). At trial, three witnesses who had seen the single photograph—Styron, Mayson and Customs Agent Ciaurro—identified Stankowitz as the "Buddy" involved in the conspiracy. Each of these witnesses had observed Stankowitz at close range on numerous occasions. We find no error in these identifications.

## VI. DISCOVERY OBLIGATIONS UNDER RULE 16

Stankowitz, whose entire defense at trial was misidentification, claims that the prosecution violated the discovery obligation of Fed.R.Crim.P. 16[18] in that it did not pro-

---

**16.** Rule 801(d)(2)(E) provides for the admission of statements "by a co-conspirator of a party during the course of and in furtherance of the conspiracy."

**17.** We note particularly that the record reflects very few statements of non-testifying conspirators which were admitted pursuant to Rule 801(d)(2)(E), as all of the major conspirators testified at trial.

**18.** Rule 16(a)(1)(A) provides that upon a defendant's request "the government shall permit [inspection and copying of] ... papers and documents ... which are within the possession, custody or control of the government...."

duce before trial an Avis rental agreement showing the name and signature of Rollie Stankowitz, Jr. which was later admitted into evidence. The record demonstrates that this allegation is baseless.

At trial, the government introduced the records of Avis agencies in Mobile and Pensacola to show that appellant Cannington had rented particular vehicles in that area during the period of the charged conspiracies. The government first called a witness from the Avis office in Mobile who identified GX 7 as a rental agreement that showed that Freddie Cannington had rented a car from February 18 to March 7, 1981.

The contract showed further that the vehicle had been returned in Pensacola where another car was picked up. The second car was retained until March 26, 1981. At the conclusion of the testimony, the prosecutor inquired of the court if she might "have a moment to find out from this [Avis employee] I have from Pensacola if he has the same exact records?" During that conference, the prosecutor discovered that the Pensacola document was not a duplicate, as she expected, but carried the name and signature and driver's license number of a second driver—Rollie Stankowitz, Jr. She immediately provided appellant with the document.

Out of the presence of the jury, Stankowitz objected to the introduction of the document. The court determined that the government had not obtained the document by administrative subpoena and that the prosecutor had not seen the document until the moment she exited the courtroom to talk to the Pensacola witness. The prosecutor further explained that she had subpoenaed the Pensacola witness based on the Mobile copy of the rental agreement. The court then heard testimony from the witness concerning the computer preparation of the Avis records. This testimony established that the government could easily have a copy of a contract (GX 7) without the signatures that appear on the original contract (GX 8). At the conclusion of this testimony, the court ruled that the prosecu-

tion had not violated Rule 16 because it had not had possession of the challenged document.

The evidence overwhelmingly demonstrates that the government could not and did not violate its Rule 16 discovery obligation with respect to the Avis rental agreement. It is the trial court which must determine if the government acted in good faith with respect to Rule 16. The court determined that the government did not *have* the document, and correctly noted that a party cannot produce what it doesn't have. The court acted well within its discretion.

## VII. PROSECUTORIAL COMMENT

Stankowitz contends that the prosecutor made statements in her closing argument which were not supported by the record. As no objection to the argument was made at trial, our review is limited to a consideration as to whether the remarks were so prejudicial that they constituted plain or fundamental error. *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *United States v. Morris*, 568 F.2d 396, 402 (5th Cir.1978). We find that all of the prosecutor's remarks cited by Stankowitz constitute fair comment on the evidence in the record and do not approach the standard of plain error.

## VIII. CONSECUTIVE SENTENCING

During oral argument, a colliquy with counsel took place regarding the manner in which appellants' indictments were drafted and concerning the trial court's imposition of consecutive sentences for violations of § 963 (conspiracy to import) and of § 846 (conspiracy to distribute and to possess with intent to distribute). In view of that discussion, we have reviewed the record and controlling authorities and find no error.

The specific issues raised during oral argument centered around the legal basis for

indicting, as was done in this case in two counts, a single conspiracy which has as dual objectives the violation of more than one conspiracy statute and for imposing consecutive sentences based upon the violation of those statutes. These issues, which troubled the courts for several years following passage of the 1970 Drug Control Act, were resolved in *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), a decision which upheld cumulative punishments for the violation of § 963 (importation) and § 846 (distribution). The Supreme Court in *Albernaz* found that Congress intended to authorize cumulative punishments when it established the two distinct statutory conspiracy offenses in the 1970 Act. The Court held that when Congress intended to authorize separate and consecutive punishments for *different crimes,* imposition of such sentences does not violate the Double Jeopardy Clause of the Constitution. *See also Missouri v. Hunter,* 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983) (taking the analysis of *Albernaz* one step further by holding that the Double Jeopardy Clause does not prohibit the imposition, at a single trial, of cumulative convictions and punishments for two or more statutorily defined offenses that, while constituting the *"same crime,"* are specifically intended by the legislature to carry separate punishments).

CONCLUSION

Finding no merit in appellants' contentions, we AFFIRM the decision of the trial court as to all counts.