The appellant, Tabitha Sue Moore, was indicted by the Marshall County Grand Jury on January 20, 1987, for assisting in the murder of Greg Pruitt, a violation of § 13A-6-2, Code of Alabama 1975. The appellant, on May 8, 1987, was also indicted for the solicitation and conspiracy to murder Greg Pruitt, a violation of § 13A-4-1 and § 13A-4-3, Code of Alabama 1975. The State, on June 15, 1987, filed a motion to consolidate the appellant's case with that of her co-defendant, Michael Hunt. Pursuant to the motion, a hearing was held and the trial court consolidated the cases for trial. The appellant's trial commenced on July 7, 1987. The trial court, during trial, severed the appellant's case from that of her co-defendant and the appellant's trial continued. The jury found the appellant guilty of murder and the trial court sentenced her to life imprisonment.
The State's evidence tended to show the following:
On the night of December 20, 1986, the victim, Greg Pruitt, his brother, Mark Pruitt, and Mark's wife, Kathy, were at the "Class of '57" lounge. Around 10:00 p.m., they were joined at the table by Michael Hunt. Hunt told the victim that the appellant's car had broken down and that he would drive him to meet the appellant at B B's lounge. Unknown to the victim, the appellant, Michael Hunt, and Billy Brannon had planned to kill the victim that night. Hunt's story that he told the victim at the lounge was a facade in order to lure the victim to his death. Hunt and the victim left the "Class of '57" lounge in Hunt's car. However, Billy Brannon, armed with a .35 caliber rifle, was hiding in the trunk of Hunt's car. Hunt and the victim did not go to the B B lounge. Instead, Hunt drove to a secluded area in the rural part of Etowah County, known as "Tain't Much Dam." Hunt and the victim got out of the car. Hunt then opened the trunk and Brannon got out and shot the victim. Hunt and Brannon then took the victim's body to *Page 418 
Aurora Lake in order to dispose of it. Later, Brannon and Hunt returned to the appellant's trailer. Ronnie Harper and his wife, Kim, were at the appellant's trailer when Brannon and Hunt arrived. Brannon and Hunt asked the appellant for extra clothes, gloves, plastic bags, and cement blocks. The appellant, before Brannon and Hunt left, told Brannon to take a camera and get some pictures. Later, Brannon returned alone with "blood all over him." Ronnie Harper testified that Brannon then told them about the murder and that he and Hunt had dumped the victim's body in Aurora Lake. Ronnie Harper testified that the appellant told Brannon, "You did a good job, baby," that Brannon told him he had killed the victim out of his love for the appellant, and that Brannon gave the appellant eight dollars that he removed from the victim's body.
Kim Harper's testimony corroborated that of her husband. She testified that the appellant had asked her to babysit the appellant's son so she could "set up" the victim and that the appellant told her that they had been planning it for two weeks. She testified that the appellant and Brannon talked about keeping their stories straight, and that Brannon told her that the appellant told him to kill the victim instead of beating him.
The Harpers reported the crime to the Boaz police at 1:00 a.m.
The victim's body was found in the early morning hours of December 21, 1986, near the "Tain't Much Dam" area of Lake Aurora in Etowah County. The body was lying in the edge of the water with hay bailing twine wrapped around it and tied to cement blocks. The victim's head was covered with a garbage bag. Officer John Maze, of the Albertville Police Department, testified that there was a huge pool of blood surrounding the body and that .35 caliber rifle spent cartridges were found at the scene.
Detective Tommy Cole, of the Albertville Police Department, was the investigating officer, and he arrived on the scene at approximately 5:00 a.m. Detective Cole and Officer Darrell Childress left the scene and went to the appellant's trailer, where they observed Brannon's Jeep and Moore's car parked out front. Detective Cole testified that he saw, in plain view, a .35 caliber rifle on the front seat of the appellant's car. The front door to the appellant's trailer was open, and Detective Cole knocked loudly on the front door. He identified himself as a police officer, but no one came to the door. He stepped inside the trailer and walked down the hallway of the trailer until he reached the back bedroom. There, he saw Brannon and the appellant in bed. Detective Cole announced that he was investigating a homicide and ordered Brannon to get out of bed. Brannon, upon getting out of bed, had blood on his hands and on his blue jeans. Detective Cole advised the pair of their constitutional rights and the appellant gave her permission to search the trailer by signing a "Permission to Search" form. The officer recovered bloodstained jeans, tennis shoes, a shirt, and a sweater which appeared bloodstained. Brannon's .35 caliber rifle was also confiscated in the search. At approximately six o'clock a.m., Brannon was taken to the Albertville Police Department for questioning.
Detective Cole, at approximately 7:45 a.m., arrived at Michael Hunt's home. Hunt resided with his mother. Detective Cole informed Hunt that he was investigating a homicide and that he believed Hunt was involved. Hunt was read hisMiranda rights and Hunt's mother gave her permission to search by signing a "Permission to Search" form. Detective Cole testified that he found freshly washed bloodstained clothes in the washroom and a spare tire that had bloodstains and body particles on it. Hunt told Detective Cole that the tire came from the trunk of his car and gave them permission to search the trunk, whereupon Detective Cole observed that the trunk was nearly covered with blood. Body parts and small particles of body tissue (brains) were found in Hunt's car trunk. Additionally, a bloodstained glove was found in the yard. Detective Cole, upon completion of the search, transported Hunt to the Albertville Police Department. *Page 419 
The appellant, a few hours after Hunt was brought to the police station, voluntarily came to the Albertville Police Department and was questioned by Detective Cole. Later that afternoon, she was arrested at her home, read herMiranda rights, and questioned again by Detective Cole and Detective Ed Whitten. In her oral statement to Detectives Cole and Whitten, the appellant revealed the incidents of the previous night's murder but did not confess to planning the victim's murder or participating in the crime.
At trial, the parties stipulated to the following facts:
The victim, Greg Pruitt, was killed by a gunshot blast to the head fired by Billy Brannon on December 20, 1986, at "Tain't Much Dam." The victim's body was recovered on the morning of December 21, 1986, at Aurora Lake. The cause of death was a gunshot wound that was inflicted by Billy Brannon. The .35 caliber rifle discovered by Detective Cole in the appellant's vehicle was the murder weapon, and the spent cartridges found at the scene were fired from a .35 caliber rifle.
The jury, following deliberations, returned a verdict of guilty, and the trial court sentenced her to life imprisonment. The appellant raises five issues on appeal.
 I
The appellant contends that the State's evidence was insufficient to support a conviction for murder. The appellant, at trial, argued that although she had been part of a conspiracy to assault or "rough up" the victim, she was not part of a plot to kill the victim.
The testimony the appellant finds objectionable is that of her co-conspirator, Billy Joe Brannon. She alleges that no proof at all, outside of Brannon's hearsay statement to third parties, connected her to the killing or that she knew the killing was to take place. Specifically, she alleges that there was no positive evidence of any conspiracy to commit murder before the statement of her co-conspirator or co-defendant, Billy Joe Brannon, was admitted. Therefore, she says the trial court was in error to admit these statements, and without these statements the evidence was insufficient to convict her of murder.
The appellant, in support of her contention, cites Ingle v.State, 415 So.2d 1225 (Ala.Cr.App. 1982), which states in pertinent part:
 "[B]efore the declarations of a co-conspirator are admitted against the defendant, there must be evidence of a conspiracy. Langham v. State, 243 Ala. 564, 11 So.2d 131 (1943). The proof of the existence of the conspiracy must be independent of the statements of the defendant's co-conspirators. United States v. Hodges, 606 F.2d 520 (5th Cir.), cert. denied, 444 U.S. 1035, 100 S.Ct. 708, 62 L.Ed.2d 671 (1979); Collins v. State, 137 Ala. 50, 34 So. 403 (1903). The initial existence of a conspiracy may not be proved by the statements of the co-conspirators. DeBardeleben v. State, 16 Ala. App. 367, 77 So. 979, cert. denied, 201 Ala. 523, 78 So. 877 (1918)." Id. at 122829.
In Bright v. State, 485 So.2d 398, 401 (Ala.Cr.App. 1986), we held that "before a co-conspirator's statement or act will be admissible against the accused, proof must be made of the conspiracy. C. Gamble, McElroy's Alabama Evidence, § 195.03(2) (3d ed. 1977)."
The existence of the conspiracy must be shown by "evidence independent of the hearsay statements" of the co-conspirator.United States v. Cannington, 729 F.2d 702, 711 (11th Cir. 1984).
However, in the case at bar, the evidence presented by the State, even without the testimony the appellant finds objectionable, was sufficient to convict the appellant.
Kim and Ronnie Harper testified for the State as to the activities they witnessed on the night of the crime. The appellant told Kim and Ronnie Harper that she had to go and "set up" the victim to be "roughed up." The appellant told them that Billy Joe Brannon and Michael Hunt were going to "rough up" the victim for her and she told the Harpers how the plan was to work. Later, when Brannon and Hunt returned to *Page 420 
the appellant's trailer, the appellant gave them the gloves, garbage bags, extra shirts, some concrete blocks, and a camera because she wanted pictures of the victim's body. The appellant told Kim Harper that she had been planning this for two weeks. Earlier in the evening, the appellant told the Harpers that, "For example say I'm the mafia and I want somebody eliminated, I would hire somebody to eliminate them." When Brannon returned, the appellant took his bloodstained shoes and washed them. Brannon and the appellant also insisted on keeping their stories straight. The Harpers heard the appellant tell Brannon when he returned from disposing of the body, "you did a good job, baby." Ronnie Harper testified that Brannon told him he killed the victim and told him of his love for the appellant, and that Brannon told him that he killed the victim because the appellant told him to do so.
This appellant was indicted and tried pursuant to § 13A-2-23, Code of Alabama 1975, which provides:
 "A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
 "(1) He procures, induces or causes such other person to commit the offense; or
 "(2) He aids or abets such other person in committing the offense; or
 "(3) Having a legal duty to prevent the commission of the offense, he fails to make an effort he is legally required to make."
It should be noted that C. Gamble, McElroy's AlabamaEvidence, § 195.03(2) (3d ed. 1977), supplemented in 1987 (p. 411), states:
 "Before a co-conspirator's statement or act will be held admissible against the accused, proof must be made of the conspiracy. Such proof may consist solely of circumstantial evidence. The trial court has wide discretion in the admission of evidence tending to show the conspiracy.
 "Although proof of the conspiracy should be made before admittance against the accused of the co-conspirator's act or statement, subsequent proof of the conspiracy cures any error in prematurely admitting the act or statement.
 "Proof both of the accused's and another's membership in the alleged conspiracy may consist solely of accused's own admission or confession of such membership." (Emphasis added.)
Thus, the statement would be admissible as a statement made by a co-conspirator in the furtherance of a conspiracy. Also, the statements would be admissible when viewed as part of theres gestae. Statements made by a co-conspirator within the resgestae of the crime are admissible against the defendant.Durden v. State, 18 Ala. App. 498, 93 So. 342, cert. denied, Exparte Durden, 208 Ala. 697, 93 So. 922 (1922).
The record reveals that the evidence in the case sub judice
strongly shows that the appellant conspired to kill Greg Pruitt and/or aided and abetted in the commission of the substantive crime.
Section 13A-2-23 abolishes the distinction between principals and accessories. See Faircloth v. State,471 So.2d 485 (Ala.Cr.App. 1984), aff'd, 471 So.2d 493 (Ala. 1985); Lewisv. State, 469 So.2d 1291 (Ala.Cr.App. 1984), aff'd,469 So.2d 1301 (Ala. 1985).
" 'Any word or act contributing to the commission of a felony, intended and calculated to incite or encourage its accomplishment, whether or not the one so contributing is present, brings the accused within the statute that makes that person concerned in the commission of a felony, directly or indirectly, a principal.' " Payne v. State, 487 So.2d 256
(Ala.Cr.App. 1986).
Any person aiding and abetting in the commission of a crime is guilty as a principal and is punishable equally with the perpetrator of the crime. Hammond v. State, 497 So.2d 558
(Ala.Cr.App. 1986).
Therefore, since Brannon's statement was correctly admissible and subsequent *Page 421 
evidence tended to establish proof of a conspiracy, there was no error in admitting the statement. The evidence presented as to the conspiracy was sufficient to present a jury question.
In Norvene v. State, 436 So.2d 23, 24 (Ala.Cr.App. 1983), we held:
 "On a motion to exclude state's evidence this Court is required to view state's evidence most favorable to the state, and not substitute its judgment for that of the jury. Where the evidence presented by the state raises questions of fact for the jury, and if believed by the jury, and is sufficient to sustain a verdict of guilty, this Court should not disturb the jury verdict." (Citations omitted.)
Therefore, since the question of whether the appellant conspired to "rough up" or kill the victim is a question of fact and the evidence was sufficient to sustain the jury's verdict, the appellant's contention in regard to this issue is to be decided adversely to her.
 II
The appellant next argues that the trial court erred when it sentenced her to life imprisonment on her murder conviction. Specifically, she argues that her life sentence was disproportionate to co-defendant, Michael Hunt's, sentence. Hunt pleaded guilty and received fifteen years for his participation in the crime. However, Michael Hunt's sentence does not appear in the record; therefore, this issue is not correctly before this court for review.
A review by the Court of Criminal Appeals is limited solely to matters appearing in the record, and a reviewing court cannot predicate error on matters which are not shown in the record. Abbott v. State, 494 So.2d 789 (Ala.Cr.App. 1986);Fuller v. State, 472 So.2d 452 (Ala.Cr.App. 1985); Hollins v.State, 415 So.2d 1249 (Ala.Cr.App. 1982).
This court is bound by the record and not by allegations or arguments in brief reciting matters not disclosed by the record. Moore v. State, 457 So.2d 981 (Ala.Cr.App.), cert. denied, 470 U.S. 1053, 105 S.Ct. 1757, 84 L.Ed.2d 820 (1985).
However, the appellant cites Ex parte Harbor, 465 So.2d 460
(Ala. 1985), and Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001,77 L.Ed.2d 637 (1983), as authority for why review should be granted when disproportionate sentences are involved. The case at bar is distinguishable from both Ex parte Harbor, supra, andSolem, supra, because both of those cases concerned sentences which were disproportionate to the crimes involved. In the casesub judice, the appellant received life imprisonment for murder and it cannot be conceived that this is in any way a disproportionate sentence. The appellant, in her brief, readily admits that her life sentence on her murder conviction was within statutorily prescribed limits.
In Lyle v. State, 497 So.2d 834, 836 (Ala.Cr.App. 1986), we held:
 "It is not within the province of the Court of Criminal Appeals to review sentences which are within statutorily prescribed limits, as was the sentence in this case. Pickron v. State, 475 So.2d 600, 601 (Ala.Cr.App. 1985); Maye v. State, 472 So.2d 688, 690 (Ala.Cr.App. 1985)."
Even had this issue been preserved for review, the proportionality analysis of Solem v. Helm, 463 U.S. 277,103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), is not required here. InMaddox v. State, 502 So.2d 790 (Ala.Cr.App. 1986), writ denied,Ex parte Maddox, 502 So.2d 794 (Ala. 1987), and in Atkins v.State, 497 So.2d 598 (Ala.Cr.App. 1986), we determined thatSolem v. Helm, supra, is inapplicable to sentences less than life without parole, and that the appellate courts are not required to test all sentences against the proscriptions of the cruel and unusual punishment clause of the Eighth Amendment to the Constitution.
In Maddox, supra, the defendant received a 15-year sentence for drug trafficking and his coactor pleaded guilty and received a four-year sentence. In Maddox, supra, we applied the principles expounded in Rummell v. Estelle, 445 U.S. 263,100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), rather than the traditional proportionality analysis *Page 422 
set forth in Solem, supra, to hold that a variation in sentences between coactors in a criminal transaction alone does not make a sentence that is harsher to one than to the other, cruel and unusual.
The mere fact that the appellant received a sentence of life imprisonment (with the possibility of parole), and her co-defendant, Michael Hunt, received a 15-year sentence, pursuant to a plea bargain agreement, does not make her sentence disproportionate so as to constitute cruel and unusual punishment, according to the principles set forth inRummell, supra, Maddox, supra, and Atkins, supra.
Moreover, in United States v. Chase, 838 F.2d 743, at 751 (5th Cir. 1988), cert. denied, Mesa v. United States, ___ U.S. ___, 108 S.Ct. 2022, 100 L.Ed.2d 609 (1988), the Fifth Circuit Court of Appeals held:
 "[A] codefendant's sentence is immaterial to the propriety of a sentence imposed on a defendant. United States v. Nichols, 695 F.2d 86, 93 (5th Cir. 1982). Indeed, 'the government is permitted to encourage guilty pleas by offering substantial benefits to a defendant, and [the appellant] having rejected the offer of a plea bargain, cannot complain that his codefendants received the benefit of a lighter sentence.' United States v. Johnson, 679 F.2d 54, 58 (5th Cir. 1982); see also Corbitt v. New Jersey, 439 U.S. 212, 223-24, 99 S.Ct. 492, 499-500, 58 L.Ed.2d 466 (1978)."
Additionally, an analogous Illinois case, People v. King,165 Ill. App.3d 464, 116 Ill.Dec. 329, 335, 518 N.E.2d 1309, 1315
(1988), held that disparity in sentencing may be proper where one co-defendant receives a lighter sentence pursuant to a plea agreement and that sentence is no basis for comparison to another co-defendant's sentence.
Therefore, for the reasons listed above, the appellant's argument in this regard must be decided adversely to her.
 III
The appellant next alleges that the trial court abused its discretion by consolidating her case with that of her co-defendant, Michael Hunt.
The appellant's case and Michael Hunt's case were severed after the first two witnesses testified. The appellant's allegation of prejudice concerns a statement made by Hunt which she claims amounted to a confession and, therefore, violated her right to cross-examination. However, a close reading of the record reveals that Hunt's statement was not a confession per se but that Hunt was merely repeating the question of the police investigator when he used the "after I killed him" language. Hunt's statement clearly reveals that the victim was shot by Billy Joe Brannon. Furthermore, the parties at trial stipulated that the victim was killed by a single gunshot wound to the head and that Billy Joe Brannon was the triggerman. It is readily apparent to this court that Hunt's out-of-context quote was not a confession.
Pursuant to A.R.A.P. 45, any error concerning consolidation due to this statement was harmless due to the fact that the cases of the appellant and Hunt were severed and the statement was not used at trial.
The appellant alleges several other instances of prejudice prior to severance but she fails to show that the jury could not follow the trial court's instructions. The test of whether severance should be granted is set out in Holsemback v. State,443 So.2d 1371, 1378 (Ala.Cr.App. 1983), which states in pertinent part:
 "The test of whether a severance should be granted on the grounds of prejudice to the defendant is whether under all the circumstances as a practical matter it is within the capacity of the jurors to follow the court's instructions and to collate and apprise the independent evidence against each defendant solely upon that defendant's own acts. . . . The trial judge must weigh the prejudice attendant to a joint trial against the interest of judicial economy. 'Of necessity, this balancing process is committed in the first instance to the sound discretion of the trial judge, and an appellate court will not substitute its own judgment for that of the lower court absent an affirmative *Page 423 
showing that the lower court has abused its discretion.' [U.S. v.] McLaurin, 557 F.2d [1064] at 1075 [5th Cir. 1977]."
In the case at bar, the appellant has not shown, and the record does not reveal, that the trial court, in originally granting a consolidation pursuant to A.R.Crim.P.Temp. 15.4, had abused its discretion. Additionally, in view of the test for severance and the considerations set out above, we can find no compelling prejudice to exist here that would deny the appellant a fair trial on the basis of consolidation and severence.
Therefore, for the reasons listed above, the appellant's contentions in this issue must be decided adversely to her.
 IV
The appellant next contends that the trial court erred when it admitted alleged hearsay statements by the appellant's co-conspirators into evidence. We disagree.
The first alleged error the appellant cites concerns the hearsay statements of co-defendant Michael Hunt when he picked up the victim at the restaurant. Mark Pruitt, the State's witness and the victim's brother, testified as to what Hunt said. Hunt's statements were made before the murder and clearly revealed that they were made in furtherance of the conspiracy to lure the victim to his death. These statements by Hunt would be admissible hearsay and were correctly admissible against the accused. C. Gamble, McElroy's AlabamaEvidence, § 195.03(1) (3d ed. 1977) states in pertinent part:
 "Where proof of a conspiracy exists, any act or statement by an accused's co-conspirator in the commission of the crime, done or made before the commission of the crime, during the existence of the conspiracy and in the furtherance of a plan or design, is admissible against the accused. . . ."
The second error the appellant raises in this issue concerns the statements made by the appellant's co-conspirator, Billy Joe Brannon. Ronnie Harper, a State's witness who was present when Brannon made the statements, was allowed to testify that Brannon told him that he (Brannon) killed the victim because the appellant told him to do so. The record reveals that the appellant was present when Brannon told Kim and Ronnie Harper that he had killed the victim. However, the record also reveals that the appellant was not present when Brannon told Harper that he killed the victim because he loved the appellant and because the appellant told him to do so. InCarpenter v. State, 404 So.2d 89 (Ala.Cr.App. 1980), cert. denied, Ex parte Carpenter, 404 So.2d 100 (Ala. 1981), we held, in pertinent part:
 "[I]f declarations are made before or during the furtherance of the conspiracy, they are admissible. However, once the conspiracy has come to an end, by completion of the common plan or design, such declarations are inadmissible unless made in the presence of and with the knowledge and consent of the other confederate." Id. at 95-96.
However, this statement was correctly admitted as part of the res gestae of the crime. Brannon's statement to Harper was part of the total picture of the criminal act. Brannon's statement to Harper came immediately after the crime. The appellant, after supplying Brannon with the necessary items to dispose of the body, was in the process of "covering up" the crime by washing the bloody clothes and "getting their stories straight" when Brannon made the statements in question to Ronnie Harper. C. Gamble, McElroy's Alabama Evidence, § 195.03(10) (3d ed. 1977), reads:
 "An act or statement by a co-conspirator is provable against the accused if it is so closely connected and coordinated in time and place with the principal criminal act as that a sound-motion picture of the crime which did not show such act or statement would be reasonably considered as an imperfect portrayal of the crime. Some courts have chosen to state this in terms of the act or statement being within the res gestae of the primary criminal act." (Footnotes omitted.)
Statements made by a co-conspirator within the res gestae of the crime are admissible against the defendant. Durden v. *Page 424 State, 18 Ala. App. 498, 93 So. 342, cert. denied, Ex parteDurden, 208 Ala. 697, 93 So. 922 (1922).
Thus, the killing of the victim, Greg Pruitt, and the statements by Brannon to Ronnie Harper are all part of a continuing transaction in which only a short period of time elapsed. Therefore, the statements were admissible as part of the res gestae and the appellant's contentions must be decided adversely to her.
 V
The appellant's final issue is whether the trial court erred in declaring the State's witness, Ronnie Harper, to be the court's witness and allowing the State to cross-examine him on the basis that his trial testimony was contrary to his prior statements.
Ronnie Harper, at trial, was recalled by the State after having been previously questioned on direct and cross-examination earlier in the trial. Harper, at that time, answered a question directed to him by the State with an answer that was inconsistent with a statement he had previously given investigators. The following colloquy occurred:
"Q My question now is, did you in the course of your conversation with Mr. Brannon ask him whether or not he — excuse me, whether or not Tabitha Sue Moore had asked him to kill Greg Pruitt, yes or no?
"A Yes or not?
"Q Yes, did you ask him that, or no, you did not ask him that?
"A I didn't — not exactly that.
"Q All right. Did you ask any question similar to that?
"A Yes, sir.
"Q Okay. What was the question you asked him?
"A I asked him why he did it, and, uh, he was — he was real nervous and he wouldn't answer, and I said, 'Did you do it for Tabitha?' and he said yes. I said, 'For love out of Tabitha?' and he said yes.
"Q You said 'for love out of Tabitha?'
"A Yes.
"Okay, Ronnie, yesterday I asked you if you remembered a transcript that you had given to Mr. Edsel Whitten on December 22, 1986 —
"A Yes, sir.
"Q — and you said you did?
"A Yes, sir.
"Q You said you had looked at that transcript?
"A Uh-huh (indicating yes).
"Q I believe you even read it over yesterday, didn't you?
"Q Yes, sir.
"Q And you said it was a true and accurate transcript of what you had said on the day of December the 22nd?
"A Right.
"Q I'll ask you, to refresh your recollection, if you will read the statement that you said, it says: 'Ronnie — on page 8 of this statement —
"MR. TAYLOR: Wait a minute. We're going to object to hearsay. No proper predicate is laid. He's attempting to impeach his own witness.
"THE COURT: Overruled.
"MR. TAYLOR: We except.
"Mr. Thompson (Continued):
"Q Have you read it?
"A Yes, sir.
"Q Is that a correct statement, what you said at that time?
"A Yes.
"Q And is that a correct statement?
"A Yes. It's a correct statement of what I said at the time.
"Q Well, is it a correct statement, though?
"A It's, uh — yes.
"Q What did you tell Mr. Whitten then relative to whether or not you asked Ms. Moore that question, of whether or not — excuse me, let me rephrase my question.
"Is this a correct statement about whether or not you asked Billy Brannon whether *Page 425 
or not Ms. Moore asked him to kill Greg Pruitt?
"A I asked him if he did it for Tabitha, and he said yes.
"Q He said he did?
"A Yes.
"Q All right. Are you saying then that the statement that you made at this time is not correct? I want to get it clear.
"MR. TAYLOR: We object. He's attempting to impeach his own witness in every way possible.
"THE COURT: Yes, I think sustained. That's repetitious, also.
"Mr. Thompson (Continued):
"Q Well, you have read this statement right here (indicating)?
"A Right.
"Q Does it — is it an accurate statement of what you said on December the 22nd?
"MR. TAYLOR: Object —
"THE COURT: Sustained.
"Mr. Thompson (Continued):
"Q Does this statement refresh your recollection of what you said on December 22nd?
"MR. TAYLOR: Same objection.
"THE COURT: Overruled.
"A Yes, sir.
"Q It does?
"A Does it —
"Q Does it refresh your recollection of what you said to Mr. Whitten on December the 22d 1986?
"A It's — it's hard to recall exactly, you know.
"Q I understand it's hard to recall what happened seven months ago and the words that were said. I'm asking you if, after reading the statement that you said is accurate in its totality, if the statement that you gave Mr. Whitten regarding the questions that I've just asked you refreshed your recollection about what you said back at that time?
"MR. TAYLOR: Same objection.
"THE COURT: Overruled.
"A Yes, sir.
"Mr. Thompson (Continued):
"Q Again I ask you, did you ask Mr. Brannon the question, 'Did Tabitha Moore ask you to do it?' — to kill Greg Pruitt?
"MR. TAYLOR: Your Honor, he's already answered the question.
"THE COURT: Sustained.
"MR. THOMPSON: If you don't mind, Your Honor — is it sustained because of the repetition?
"THE COURT: Yes.
"MR. THOMPSON: Your Honor, we would like the Court to declare Mr. Harper a hostile witness in this case for refusing to answer a question that we think is pertinent in this case.
"And we have, I think, shown already the connection between he and his wife and the defendant in this case. And we want the right to cross-examine him.
"MR. TAYLOR: We object —
"THE COURT: I think he's answered what you've asked. I don't believe that there's any hostility in his answer —
"MR. THOMPSON: Your Honor, it is a surprise to the State, and the State would contend that his testimony is not the same as it has been previously.
"THE COURT: Let me see the statement, please.
"(Counsel hands statement to the Court.)
"THE COURT: Let me see the attorneys, please.
"(Whereupon, a Bench conference was had between counsel and the Court, outside the hearing of the jury:)
"THE COURT: I'm not going to let him take out of context one sentence of the whole thing. It's very uncertain — there's a whole series of questions there, but just to ask him about one sentence is misleading involving the whole statement.
"MR. THOMPSON: We'll be glad for it all to go in. We've got an unmarked copy of it —
"MR. TAYLOR: For the record, we want to object. First of all, he's attempting to *Page 426 
impeach his own witness, and there's been no predicate laid.
"Secondly, he's attempting to get in only a portion of whatever he may have said.
"Thirdly, he has already answered the question. He said, 'My best recollection is' — so forth, whatever he said.
"MR. THOMPSON: That is not correct. He said this was an accurate statement. I have asked him again and again and again whether or not he said that and he refuses to answer regarding that.
"THE COURT: All right. I'm going to declare Mr. Harper the Court's witness and allow you to examine on that complete statement.
"Go ahead, Mr. Thompson.
MR. TAYLOR: We except.
"THE COURT: Yes, sir.
"(Whereupon, the following proceedings occurred in the hearing of the jury:)
"Mr. Thompson (Continued):
"Q Mr. Harper, once again I'm going to hand this statement to you, and I'm going to ask you, beginning with where you start talking here, where it has your name, if you'll read a section in there that may include some ten or twelve lines of what you were saying to Mr. Whitten at that time (indicating).
"A Do you want me to read it?
"Q Just read it to yourself, to refresh your recollection.
"MR. TAYLOR: Your Honor, we further object, and we want to state the ground that he's asked him to read something that he's denied saying.
"MR. THOMPSON: Your Honor, that's not the testimony at all.
"MR. TAYLOR: He gave his best recollection —
"MR. THOMPSON: Mr. Taylor —
"THE COURT: Don't argue, gentlemen.
"Yes, sir. You've got your objection. Overruled.
"MR. TAYLOR: We except.
"Mr. Thompson (Continued):
"Q Okay. Have you read it?
"A Yes, sir.
"Q Do you know what's said there?
"A Yes.
"Q Is that an accurate statement of what you said to Mr. Whitten back on December the 22nd?
"A Yes, sir.
"Q All right. I'm going to ask you, Ronnie, you begin in this statement, do you not, by telling about your wife walking out of the room, and at that time then Mr. Brannon asking you what you know?
"A Yes, sir.
"Q Okay. What did you tell him?
"A I told him that I thought that he killed Greg.
"Q Okay. And what did he say?
"A He said that he did.
"Q He said that he killed him. What specifically — how specifically did he say that when he said that he did?
"A He said that he did kill Greg for Tabitha.
"Q He said he killed Greg for Tabitha. Okay. And then did you ask him at that time why he did it?
"A Why he did it?
"Q Yes, sir.
"A Yes, sir.
"Q What did he say?
"A He said he did it for love out of Tabitha — out of love for Tabitha.
"Q Now, Ronnie, I know you want to get that in and we'll get to that in a minute and you'll be able to testify that he did it out of love for Tabitha, but let's stay with what you've said, okay?
"What did he say right here in your statement — and what did you say to Mr. Whitten two days after this incident happened, when you asked him why he did it?
"Look what you said right there, and then tell us if that's a correct statement (indicating).
"A That's the statement I gave, yes, sir. *Page 427 
"Q And what did he say when you asked him why he did it?
"A He said that Tabitha wanted it done.
"Q That Tabatha wanted it done. All right. Then right following that, I'll ask you again if you asked him if Tabitha asked him to do it?
"A Yes, sir.
"Q You did ask him that?
"A Yes, sir.
"Q Okay. And then what did he say in response to that?
"MR. TAYLOR: Your Honor, for the record, we want to further object on the ground that all of this is outside the presence of this defendant and it's all hearsay.
"THE COURT: I understand. Overruled.
"MR. TAYLOR: We except.
"Mr. Thompson (Continued):
"Q What did he say?
"A I asked him if Tabitha wanted him to do it, and he said, 'Yes, she did.' "
The appellant claims the trial court erred in allowing the State to question the witness in this manner. The State claims that it was surprised by the witness's answers and that it was trying to refresh the witness's memory concerning his prior statement.
The gist of the appellant's argument is that the trial court erred in calling Harper the "court's witness" and allowing the prosecution to cross-examine and impeach its own witness. Specifically, the appellant claims that Harper was not the "court's witness" because the trial court did not ask a question but simply declared Harper to be its witness. C. Gamble, McElroy's Alabama Evidence, § 171.01(9) (3d ed. 1977), states:
 "If a person is called as a witness by the trial judge, any party may impeach the witness. However, such person does not become the witness of the judge unless and until the witness in response to the judge's questions has testified to some relevant fact."
The appellant was correct in her assertion that Harper was not the "court's witness" and that the court improperly allowed the prosecution to continue questioning the witness about his prior statements. However, any error in this regard would be harmless; C. Gamble, McElroy's Alabama Evidence, § 165.01(7) (3d ed. 1977), states that one may examine his own witness to show surprise or to refresh the witness's recollection and that a party may remind his own witness of a previous inconsistent statement by him, for the purpose of refreshing his recollection.
In Bell v. State, 466 So.2d 167, 171 (Ala.Cr.App. 1985), we held:
 "Although one may not generally impeach his own witness, where a party is put to a disadvantage by unexpected answers, a party may, for purposes of showing surprise or for refreshing the witness's recollection, ask his witness if he had not made prior statements contrary to his instant testimony. This is permissible, after proper predicate, even though its incidental effect is to impeach the witness's testimony. Miller v. State, 431 So.2d 586 (Ala.Cr.App. 1983); Isbell v. State, 329 So.2d 133 (Ala.Cr.App.), cert. denied, 295 Ala. 407, 329 So.2d 140 (1976); Edwards v. State, 51 Ala. App. 433, 286 So.2d 308
(Ala.Cr.App.), cert. denied, 291 Ala. 777, 286 So.2d 313 (1973), C. Gamble, McElroy's Alabama Evidence, § 165.01(7) (3d ed. 1977). Under the theory of surprise, the prosecution may elicit from a witness testimony that he in fact made prior contradictory statements, and through questioning may further elicit from the witness the contents of prior statements."
Although the trial court incorrectly called Harper the "court's witness" and incorrectly allowed the prosecution to question the witness as to the prior statements he had made to the investigators, any error in this regard would be harmless because under the theory of surprise, the prosecutor may refresh the witness's recollection about his prior inconsistent statements.
Therefore, for the reasons given above, this issue is to be decided adversely to the *Page 428 
appellant, and we hold that no reversible error occurred.
AFFIRMED.
All The Judges concur.