Bobby Lane Campbell was convicted of murder and sentenced to life imprisonment. On this appeal he presents three issues, two of which will not be discussed because the third requires a reversal of his conviction.
On October 10, 1984, Martin Luther Walls was found dead at his home in Guntersville, Alabama. The coroner estimated that Walls had been dead 48 hours when the body was found and concluded that the cause of death was a .38 caliber gunshot wound to the back of the head. The homicide remained unsolved for over a year.
On October 26, 1985, November 26, 1985, and January 6, 1986, the defendant, an inmate at St. Clair Correctional Facility, gave Chief Investigator Robert Norwood of the Marshall County sheriff's office statements implicating himself in the Walls murder. The first and third statements were admitted at trial and constituted the primary evidence against the defendant. The defendant contends that these statements *Page 938 
were involuntary because they were induced by promises of leniency made to him by Jack Eubanks, another inmate at St. Clair Correctional Facility. The defendant alleges that Eubanks told him he was working with the Marshall County district attorney's office on the Walls murder investigation. The following evidence relating to Eubanks's involvement in the investigation was presented by witnesses for the State:
In the fall of 1985, Marshall County District Attorney John Starnes met with Jack Eubanks, an inmate in the state penitentiary. Eubanks offered to assist in the investigation of the Walls case, claiming that he could help with that and "some other unsolved homicides." Starnes testified that Eubanks "wanted to perfect an early release" from prison in return for his assistance. He stated that the "credibility [of Eubanks] was the fact that there was a body discovered based on information [Eubanks] had given authorities . . . in Etowah County [on another case]." Starnes decided to "accept [Eubanks'] offer of assistance."
On October 26, 1985, Chief Investigator Norwood interviewed the defendant at the St. Clair prison in the presence of Jack Eubanks. Norwood testified that he knew Eubanks had provided information on other cases and that Eubanks "had a secretary" in the prison. He stated: "It was my understanding based from the very beginning that for me to gain an interview or to get to Bobby Campbell, I had to go through Eubanks. And it was my understanding . . . that to talk with Campbell inevitably I would have to go through Eubanks." The investigator acknowledged that "at some point during the investigation Mr. Eubanks was working for the District Attorney's office or working with them in connection with the Martin Luther Walls case."
Norwood testified that he made no promises to the defendant in order to get a statement from him and that he had no knowledge of any promises made to the defendant by Eubanks or anyone else. The defendant received Miranda warnings and gave Investigator Norwood a statement, which was tape-recorded, transcribed, and admitted at trial.
In that statement, the defendant basically disclaimed responsibility for the Walls murder and cast suspicion on two other individuals, Lynn Johnson and Rick Gaskin. The defendant told Norwood that he was having financial problems in 1984. In June of that year, Lynn Johnson came to his place of business and arranged for him to get a loan for $300,000 from a "Mafia-type source." The defendant later met Rick Gaskin, who according to Lynn Johnson, had Mafia connections. In July 1984, Johnson and Gaskin took the defendant into the woods and shot at him, saying that the defendant had "plumbing problems" or "leaks," because he was "running his mouth about getting the money." The defendant told Norwood that Johnson and Gaskin intimidated him on several other occasions, once forcing him to remove $20,000 of electronic equipment, a .357 pistol, and a box of .38 caliber shells from his place of business and load them into Gaskins's van. Johnson and Gaskin threatened to kill the defendant's wife and children and to let the defendant live six months if he did not comply with their demands.
According to the defendant's statement of October 26, 1985, Johnson and Gaskin picked up the defendant at his home on October 8, 1984, and took him to a bridge. There they told him to retrieve a gun, which looked like the defendant's .357, from under the seat of the car, and to throw it off the bridge. At that time Johnson and Gaskin stated that "some old man in Guntersville had messed up and taken the money that they had coming in for [the defendant]" and "they had taken care of the old man in Guntersville." The defendant gave investigator Norwood directions to the bridge and the spot where he threw the gun.
The defendant told Norwood that he did not know any more about the Walls murder; in fact he did not know the victim's name was "Walls" until October 25, 1985, the day before he gave Norwood the statement. On that day, the defendant had a *Page 939 
conversation with Lynn Johnson and Jack Eubanks, both of whom were also incarcerated in the St. Clair Correctional Facility, in Eubanks's room at the prison. At that time, Johnson gave details about how the Walls murder was accomplished and said that Rick Gaskin was the one who shot Walls. On hearing the details of the murder as supposedly related to the defendant by Lynn Johnson, Investigator Norwood asked the defendant the following questions:
 "[Norwood]: Did [Lynn Johnson] swear you to secrecy on that . . . or was he talking fully.
 "[Defendant]: Jack [Eubanks] had mentioned immunity to him the first time I heard about it.
 "[Norwood]: And that's when he started talking to you about it?
 "[Defendant]: Telling Jack [Eubanks] had told him it would be O.K. And that's the first time I had heard about it."
On November 7, 1985, Investigator Norwood was part of a team of scuba divers that recovered a .357 revolver from a creek corresponding to the location described by the defendant. On November 26, Investigator Norwood "pulled" the defendant from St. Clair prison and took him to the A.B.I. office in Birmingham for a polygraph exam. During a conversation on the return trip to St. Clair, Norwood asked the defendant why the polygraph test had indicated "signs of deception," and the defendant replied, "I can't change my story." This, the defendant's second statement to Investigator Norwood, was not admitted before the jury.
Investigator Norwood testified that at the time he took the October 26, 1985, statement from the defendant, the "direction of the investigation . . . was . . . toward Gaskin and Johnson." After the polygraph exam and the defendant's second statement, however, "things had started changing directions and everything was pointing in a totally different direction . . . toward [the defendant]." Sometime around Christmas 1985, and before January 6, 1986, Marshall County District Attorney John Starnes had Jack Eubanks transferred from the St. Clair Correctional Facility to the Marshall County jail. Regarding that transfer, the District Attorney testified as follows:
 "Q. [By defense counsel] Did you bring Mr. Eubanks to Marshall County on at least one occasion?
"A. Yes, sir.
"Q. Did you personally talk with him?
"A. Yes, sir.
 "Q. Did you talk with him about the Defendant, Bobby Campbell?
"A. Yes, sir.
 "Q. Did you talk with him about obtaining information about the murder?
"A. Yes, sir.
". . . .
 "Q. [By then-District Attorney Thompson] Did the DA's office pay him anything for his services?
 "A. I don't recall if, ah, Mr. Whitten gave him any informant's fees or not. I — I really don't remember. The only —
"Q. Okay. Do you —
 "A. — remuneration we did give him was let him have a furlough. He did — He did have a leave from the jail.
"Q. From the County Jail over here?
"A. Yes, sir."
In response to the District Attorney's question whether Eubanks was transferred "to be here for the Grand Jury [investigating the Walls murder case]" Starnes replied, "Actually [Eubanks] was brought up here to see what all we could get out of him."
On January 6, 1985, District Attorney Starnes directed Investigator Norwood to go back to St. Clair Correctional Facility because the defendant "needed to speak with him again." On that date, the defendant made the third statement. He told Norwood that "everything in the first statement . . . was true with the exception of one point — [the defendant] was present at the Martin Luther Walls residence when the murder took place." The defendant told Norwood that he did not want to talk any further without an attorney.
At the hearing on the motion to suppress the statements, the defendant testified that *Page 940 
Jack Eubanks told him that he, Eubanks, was working with or for the Marshall County district attorney's office on the Walls murder case. Eubanks arranged the defendant's first statement to Investigator Norwood and informed the defendant that if he cooperated in the investigation he would "get out of prison." After his first statement to Norwood, the defendant had two long-distance telephone conversations with Eubanks, the latter speaking from the district attorney's office in Guntersville. During those conversations, according to the defendant, Eubanks told the defendant that "what the district attorney of Marshall County wanted so far as a statement" was for the defendant to "put himself at the scene" of the murder, and that if he made another statement correcting the first, the defendant would "get out of prison."
The defense then introduced, and the trial court admitted for purposes of the suppression hearing, Defendant's Exhibit 1, which the State acknowledged to be "a correct transcript of a tape-recorded conversation between the Defendant and Mr. Eubanks, Mr. Eubanks being present in the District Attorney's Office and being a knowing party to the taping of the conversation."
In that conversation, Eubanks reminded the defendant that Investigator Norwood had said that he "would work out a deal" with the defendant if he, the defendant, had been at the scene of the murder. Eubanks encouraged the defendant to "go with the original plan" by admitting that he was present at the murder because Johnson and Gaskins "forced" or threatened him with the death of his family: "The best thing that you would have to go with is the original plan and that was that you were forced and to work a deal out with [Norwood]."
Throughout the conversation, Eubanks assured the defendant that he was "looking after [the defendant's] best interest." He said that he was "supposed to get with [Norwood] when he finished talking with [the defendant]," stating that "we're going to work a deal out." When Eubanks asked, "Are you willing to give Bob [Norwood] a statement?" the defendant replied, "I don't know; I just don't know that . . . for sure." Later in the conversation, the defendant asked, "What kind of a deal was they talking about offering me?" Eubanks responded, "Well, you'll have to talk to Bob [Norwood] on it. . . . I'll talk with Bob on it and I'll get back with you on a deal, it's just that simple." Eubanks then repeated, "Would you be willing to talk to [Norwood]?" The defendant answered, "Well, as long as I know what the deal is." The discussion concluded when Eubanks asked, "All depends on what they are going to offer you," and the defendant answered, "Yeah."
The defense also presented the testimony of Joe Campbell, Sr., the defendant's father, at the hearing on the motion to suppress. Campbell testified that the week after Christmas 1985, someone who he later learned was Jack Eubanks but who identified himself as "Jack Little," called him, stated that he was working for the Marshall County District Attorney, and said that he was "going to help Bobby." The man made an appointment to meet Mr. Campbell at the Marshall County jail. When Campbell arrived, the man who identified himself as "Jack Little" carried a briefcase and "flashed some papers," saying that he had been in the penitentiary with the defendant, but "they had gotten him out." He said that for $600 "he would get somebody to come back and give [the defendant] another liar test and he had a friend, the FBI man, over in Atlanta." Campbell gave the man $600.
Eubanks did not testify at trial or at the hearing on the motion to suppress.
At the conclusion of the hearing on the motion to suppress, the trial court ruled that the defendant's statements were admissible. The basis for the trial court's ruling wasnot that he found the defendant's testimony about Eubanks's promises incredible, but that Eubanks could not have "reasonably appeared to the Defendant to have authority to make a deal to release him from the penitentiary in [re]turn for the statements, Section 200.06 of Gamble on McElroy." *Page 941 
Section 200.06, C. Gamble, McElroy's AlabamaEvidence (3d ed. 1977) provides:
 "A confession will not be regarded as having been induced by a threat or promise unless the threat or promise was made by a person who reasonably appeared to the accused to have the power or authority to execute the threat or procure performance of the promise. Ordinarily, a public official such as a sheriff, prosecuting attorney or judge will be regarded as having such apparent power and authority. However, the promise may render the confession inadmissible even though the promise was made by a person who held no public office or position. It has been held, for example, that the promise may come from any person connected with the prosecution, or connected with the accused, who may, considering his relations and condition be fairly supposed by the accused to have the power to secure for him whatever benefit is promised or to carry out the threatened injury." (Footnotes omitted.)
Here, the State admits that in a telephone conversation made from the district attorney's office, Eubanks offered a hope of leniency to the defendant in order to induce him to admit his presence at the scene of the Walls murder. Compare Ex parteWeeks, 531 So.2d 643, 644 (Ala. 1988) (wherein the Alabama Supreme Court held that an investigator's promise to "speak to the district attorney" on behalf of the accused negated the voluntariness of the accused's subsequent confession). An inducement was indisputably held out; the only issue is whether the defendant's statement was made in reasonable reliance upon the inducement from a representative of the district attorney's office.
On that issue, which is a mixed question of law and fact,see 3 Wigmore, Evidence § 830 at 446 (Chadbourn rev. 1970), the trial court erred. Unlike a trial court's resolution of disputed facts, which is entitled to great deference by a reviewing court, see, e.g., Bush v.State, 523 So.2d 538, 554 (Ala.Cr.App. 1988), a trial court's ruling upon the application of the law to undisputed facts, or upon a mixed question of law and fact, carries no presumption of correctness, see, e.g., Board of Managers v.Elliott, 532 So.2d 1019, 1021 (Ala.Civ.App. 1988). We find, under the totality of the circumstances, that the defendant could reasonably have believed that Eubanks had the authority to offer him a hope of leniency and the power to "secure him whatever of benefit [was] promised." Murphy v.State, 63 Ala. 1, 3 (1879).
"[F]or a confession to be impermissible by reason of its being induced by an improper promise, it is not absolutely necessary that the promisor be an officer of the law."Hinshaw v. State, 398 So.2d 762, 764 (Ala.Cr.App.), cert. denied, 398 So.2d 766 (1981). Accord, Johnson v.State, 378 So.2d 1164, 1169 (Ala.Cr.App.), cert. quashed,378 So.2d 1173 (Ala. 1979); Allen v. State,53 Ala. App. 66, 73, 297 So.2d 391, 397, cert. denied, 292 Ala. 707, 297 So.2d 399 (1974).
The following facts are significant in determining that Eubanks could have been "fairly supposed by the [defendant] to have [had] the power to secure for him the benefit promised":
(1) The defendant could reasonably assume that Eubanks occupied a position of considerable power and trust within the confines of the penitentiary. The evidence at trial established that Eubanks had his own "room" and a secretary at the prison. Eubanks told the defendant he was working with or for the Marshall County authorities on the Walls murder case, and this information was substantiated, from the defendant's point of view, by the fact that Eubanks arranged and was present during the initial interview with Norwood. The defendant could fairly have concluded not only that Eubanks had the ear of the Marshall County authorities, but also that those authorities had enough confidence in him to allow him to remain during the custodial interrogation of another inmate.
(2) During the initial interview with Norwood, the defendant said that he had heard Eubanks mention "immunity" to Lynn Johnson, another inmate, after which Johnson spoke freely of his involvement in the Walls murder. If Johnson, who defendant *Page 942 
considered a "tough guy" with Mafia acquaintances, "told all" after being promised immunity by Eubanks, then the defendant could reasonably conclude that Eubanks's influence was real and could be counted on. Moreover, Norwood's failure to disabuse the defendant of the notion that Eubanks had the authority to promise immunity to anyone involved in the Walls murder could reasonably have led the defendant to believe that Eubanks did, in fact, have such authority. From the very beginning, Investigator Norwood understood that "for [him] to gain an interview or to get to Bobby Campbell, [he] had to go through Eubanks." Norwood acknowledged that Eubanks acted as a "mediator or go-between. [Norwood] had to go between Jack [Eubanks] to get to Campbell according to their agreement."
(3) The impressions that the defendant could reasonably have formed from the conduct of Norwood, Eubanks, and Johnson, were confirmed when the defendant learned that Eubanks had left St. Clair prison for the Marshall County jail at the request of the Marshall County district attorney. These impressions could only have been strengthened when Eubanks made long-distance telephone calls from the district attorney's office, received a furlough from the Marshall County jail, and — carrying a briefcase and "flashing papers" indicating that he had been released from prison — contacted the defendant's father on behalf of the defendant.
Under the foregoing circumstances, the defendant's assumption that Eubanks was clothed with apparent authority in the Walls murder investigation was reasonable. If a confession follows a promise of leniency by one the accused reasonably believes is "clothed with some authority to . . . investigat[e]," the confession is inadmissible. Gregg v. State, 106 Ala. 44,47, 17 So. 321, 322 (1895), overruled on other grounds,Brown v. State, 142 Ala. 287, 38 So. 268 (1904).[1]
In Gregg, an infanticide case, our Supreme Court reversed the accused's conviction because it found her confession, made to persons who "appeared to [her] as clothed with some authority to institute the investigation," involuntary. 106 Ala. at 47, 17 So. at 322.
 "Walter E. Sanderson, examined as a witness, stated that he and three other negro men, hearing of the rumored birth and destruction of the infant of Martha Gregg, went to the house where Martha and her mother, Julia, the defendant, and Nancy Gregg, the grandmother of Martha lived, to investigate the matter. There can be no question, that they appeared to Julia and Nancy as clothed with some authority to institute the investigation. . . . [T]heir coming must have . . . presented the appearance of authority to them."
Id. See also Ballard v. State, 225 Ala. 202,142 So. 668 (1932) (confession to courthouse janitor, obtained through influence of hope, inadmissible); Allen v. State,53 Ala. App. 66, 297 So.2d 391, cert. denied, 292 Ala. 707,297 So.2d 399 (1974) (confession following promise of "help" by church member in the presence of jailer inadmissible). *Page 943 
The facts here present a stronger case of the promisor's authority — apparent and actual — than eitherGregg or Ballard. Here, the district attorney acknowledged the very issue in dispute when he stated that "Eubanks was working for the District Attorney's office or working with them in connection with the Martin Luther Walls case," and that he personally had talked with Eubanks "about the defendant" and about obtaining information about the murder." Compare Johnson v. State, 378 So.2d at 1168
(no evidence of "pre-arrangement between [promisor] and any investigator from the Sheriffs office or anybody else to talk to [accused] and try to get a statement from him").
"Extrajudicial confessions are prima facie
involuntary and inadmissible, and the burden is on the State to prove that the confession was made voluntarily." Ex parteCallahan, 471 So.2d 463, 464 (Ala.), cert. denied,474 U.S. 1019, 106 S.Ct. 567, 88 L.Ed.2d 552 (1985). "The burden is on the State to show proper predicates for the admission of an extra-judicial statement, specifically, here, a lack of coercion or inducements." Ex parte Weeks,531 So.2d at 645.
 " 'Any words spoken in the hearing of the prisoner which may, in their nature, generate such fear or hope render it not only proper but necessary that confessions made within a reasonable time afterwards shall be excluded, unless it is shown by clear and full proof that the confession was voluntarily made after all trace of hope or fear had been fully withdrawn or explained away and the mind of the prisoner made as free from bias and intimidation as if no attempt had ever been made to obtain such confessions.' "
Ex parte Weeks, 531 So.2d at 644 (quoting Womackv. State, 281 Ala. 499, 507, 205 So.2d 579, 587 (1967)).
In the present case, a promise of leniency was held out by one with the apparent authority to perform the promise and the State did not show that the defendant's statements were made only "after all trace of hope . . . had been fully withdrawn or explained away." The defendant's statements were therefore due to be suppressed.
The judgment of conviction is reversed and the cause remanded to the trial court.
REVERSED AND REMANDED.
All Judges concur.
[1] We note that the facts in the present case do not fall within the recent holding of the United States Supreme Court inIllinois v. Perkins, ___ U.S. ___, 110 S.Ct. 2394,110 L.Ed.2d 243 (1990). In that case, the Court held that an undercover law enforcement officer posing as a fellow inmate need not give Miranda warnings to an incarcerated suspect prior to asking him questions that may elicit an incriminating response. The Court emphasized that when a suspect speaks freely to one whom he believes to be a fellow inmate, the concerns underlying the Miranda decision are not implicated.
 "There is no empirical basis for the assumption that a suspect speaking to those whom he assumes are not officers will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess.
 ". . . When the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners. . . .
". . . .
 ". . . Respondent had no reason to feel that [the] undercover agent . . . had any legal authority to force him to answer questions or that [he] could affect respondent's future treatment."
Illinois v. Perkins, ___ U.S. at ___,110 S.Ct. at 2397-98 (emphasis added).