[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 459 
 On Application for Rehearing.
The opinion issued on October 25, 2002, is withdrawn, and the following opinion is substituted therefor.
The appellant, Tony Andra Robinson, was indicted for trafficking in marijuana, a violation of § 13A-12-231, Ala. Code 1975. Pursuant to a negotiated plea agreement *Page 460 
with the State, he pleaded guilty to possession of marijuana in the first degree, a violation of § 13A-12-213(a)(1), Ala. Code 1975. He was sentenced, in accordance with the agreement, to 10 years' imprisonment. The sentence was split, and Robinson was ordered to serve three years in prison followed by two years on supervised probation.
The record reflects that Robinson originally pleaded guilty on February 13, 2001. He appealed, and this Court affirmed his conviction and sentence in an unpublished memorandum issued on August 10, 2001. SeeRobinson v. State, (No. CR-00-1015) 837 So.2d 889 (Ala.Crim.App. 2001) (table). In our unpublished memorandum, we held that Robinson had failed to expressly reserve the right to appeal several pretrial issues before he entered his plea and that, therefore, none of the claims he raised on appeal were properly before this Court for review. Robinson then filed a Rule 32, Ala.R.Crim.P., petition for postconviction relief, in which he alleged that he was denied the effective assistance of trial counsel because counsel did not expressly reserve the right to appeal the pretrial issues before Robinson pleaded guilty. A hearing was conducted on the petition on December 4, 2001, after which the trial court, with the State's express agreement, granted Robinson's petition and allowed him to withdraw his original plea and to enter a new plea — pursuant to the same plea agreement — this time expressly reserving the right to appeal six pretrial issues.
The record reflects the following facts.[1] On February 17, 1998, United Parcel Service ("UPS") notified the narcotics unit of the Bessemer Police Department of a suspicious package in its custody. The package was addressed to 5601 Avenue O in Lipscomb, in the Bessemer Division of Jefferson County; the return address was Microtech, a company in California. After investigation, Robert Michael Bellanca, an officer with the narcotics unit attached to the Multi-Agency Drug Enforcement Team ("MADET"), determined that Microtech was a fictitious company and that the return address listed on the package was, in fact, the address of another company. Officer Bellanca then brought a drug dog to the UPS warehouse, lined up several packages, including the suspicious package, and led the dog along the "lineup" of packages. The dog alerted on the suspicious package. Pursuant to UPS policy, UPS officials then opened the package and discovered approximately five pounds of marijuana.
The following day, after obtaining an anticipatory search warrant, an undercover officer delivered the package to the Lipscomb address. Wanda Washington answered the door at the residence and signed for the package. The police then executed the search warrant and questioned Washington. Washington explained that her boyfriend, Patrick Davis, had been expecting the package and, pursuant to a request by the police, she agreed to contact Davis about the package. When she spoke with Davis, Davis "told her not to open the package or have anything to do with the package, but to place it out on the porch, that it belonged to Tony and *Page 461 
Tony would come and get the package." (Second Supp. 7.)[2]
The police placed the package on the porch and waited inside the residence for "Tony" to pick it up. Approximately an hour and a half later, Robinson's codefendant, Calvin Parker, arrived at the residence and picked up the package. When the police came out of the house and attempted to arrest him, Parker dropped the package and fled. After a short chase, Parker was apprehended. Parker agreed to cooperate with the police; he told them that he was picking up the package for "Tony Robinson" and that he was supposed to telephone Robinson after he got the package and then deliver the package to Robinson at Ski Lodge Apartments. (Second Supp. 8.) According to Parker, Robinson would be in a green or brown Mazda automobile. As the police were making preparations for a controlled delivery to Robinson, Parker received a page from Robinson.[3]
Parker then telephoned Robinson and told him, "I've got it; I'm on my way with it." (Second Supp. 10.) The police accompanied Parker in his van to the Ski Lodge Apartments in Homewood, in the Birmingham Division of Jefferson County. When Parker and the officers arrived, they saw Robinson sitting in a brown Mazda automobile at an Amoco gasoline station next to the apartments; Robinson "waved" at Parker. (Second Supp. 10.) Parker then "motioned" to Robinson to follow him to the rear of the apartment complex. (Second Supp. 10.) Robinson followed Parker to the rear of the complex, got out of his automobile, and approached Parker's van. As Parker started to hand the package to Robinson through the driver's side window of the van, Robinson noticed either the officers approaching the van or the officer in the back of the van, and instead of taking the package from Parker, he let it fall to the ground. Robinson was then arrested.
 I.
Robinson first contends that the trial court erred in denying his oral motion to dismiss the indictment on the ground that venue was not proper in the Bessemer Division of Jefferson County.[4] He asserts that venue was proper in the Birmingham Division — not the Bessemer Division — of Jefferson County, because, he says, the attempted delivery of the package to him occurred in Homewood, in the Birmingham Division.[5] *Page 462 
"In a criminal prosecution the accused has a constitutional right to a trial '[in] the county or district in which the offense was committed.'"Williams v. State, 383 So.2d 547, 555 (Ala.Crim.App. 1979), aff'd,383 So.2d 564 (Ala. 1980), quoting Ala. Const. of 1901, art. I, § 6. "Unless otherwise provided by law, the venue of all public offenses is in the county in which the offense was committed." § 15-2-2, Ala. Code 1975.[6]
Robinson was indicted for trafficking in marijuana on "February 17, 1998, while at or near 5601 Avenue O, Lipscomb, Jefferson County." (C. 2.) During his guilty plea, the State set out the factual basis for the plea as follows:
 "Your Honor, at trial the State would expect the evidence to be that on or about February 17, 1998, at approximately 1420 hours at 5601 Avenue O in Lipscomb, Alabama, that being entirely within the Bessemer Division of Jefferson County, a package was delivered at the direction of Mr. Robinson. That package being picked up by a Calvin Parker and delivered from there to Mr. Robinson at the Ski Lodge Apartments, that being the Birmingham Division of Jefferson County.
 "As the court is aware, that is one of the issues for appeal. But at any rate, the package was delivered to Parker at Robinson's direction. Picked up by Parker and brought again at Robinson's direction into the Birmingham Division to Ski Lodge Apartments where it was placed in the actual or constructive possession of Mr. Robinson."
(R. 20.) Robinson did not challenge the factual basis for the plea in the trial court, nor does he challenge it on appeal.[7] Rather, Robinson's sole argument is that the facts of the case do not support the trial court's conclusion that venue was proper in the Bessemer Division of Jefferson County. We disagree.
The facts clearly show that Robinson was in constructive possession of the marijuana that was delivered to the address in Lipscomb, which is located in the Bessemer Division of Jefferson County. As this Court noted in Wright v. State, 494 So.2d 936 (Ala.Crim.App. 1986):
 "Factually, cases have held that where the appellant never actually had possession of the drugs during the commission of the crime, he may nonetheless be guilty of aiding and abetting as well as having constructive possession of the drugs via a co-conspirator. United States v. Cannington, 729 F.2d 702 (11th Cir. 1984); United States v. Raffone, 693 F.2d 1343 (11th Cir. 1982). The jury could rely upon testimony that an appellant `had put up the money to conclude that he had aided and abetted the possession of the marijuana for its ultimate distribution.' United States v. Cannington, supra, at 709. `Alternatively, the same evidence could support the conclusion that [appellant], operating through his "lieutenant," had constructively possessed the marijuana.' Ibid."
494 So.2d at 937. The facts clearly linked Robinson to the package of marijuana and showed that Robinson had constructive possession of the marijuana, despite the fact that he was not physically at the Lipscomb address when the package first arrived. The factual basis for the plea was *Page 463 
that the package of marijuana was delivered to the Lipscomb address at Robinson's direction, and the evidence presented at the various pretrial hearings supported that conclusion. Wanda Washington's boyfriend identified the package as being for a man named "Tony"; Calvin Parker told police that the package was for Robinson and that he had been instructed by Robinson to pick it up on his behalf and to deliver it to him; and, when Parker arrived at the delivery site, Robinson waved at him, followed him to the rear of the apartment complex, got out of his vehicle, and approached Parker.
The crime for which Robinson was charged (trafficking) and the crime to which Robinson pleaded guilty (possession) occurred at the Lipscomb address, in the Bessemer Division of Jefferson County. Therefore, venue was proper in that division; the trial court properly denied Robinson's motion to dismiss the indictment on the ground of improper venue.
 II.
Robinson next contends that the trial court erred in denying his oral motion to dismiss the indictment and for specific performance of an alleged agreement between him and the State in which the State allegedly agreed not to prosecute him. Specifically, Robinson argues that after he was arrested, he entered into an agreement with the State in which he agreed to provide assistance to the State in other cases in return for the State's not prosecuting him on the present charge. According to Robinson, he provided assistance in other cases in compliance with the agreement and the State breached the agreement when it obtained the indictment against him.
The record indicates that after Robinson was arrested, he was taken to the Bessemer police station where he was advised of his Miranda[8]
rights.[9] He invoked his rights and contacted his attorney, Linda Hall. The police then questioned Robinson in Hall's presence. At one of the pretrial hearings on this issue, Officer Bellanca testified that Robinson indicated to him that he wanted to cooperate "[f]or consideration in sentencing" (R2. 41) — that he would identify his source in California and the people he sold the marijuana to in the Birmingham area, and that he would work for the police doing "reverse drug transactions" with the people in Birmingham to whom he regularly sold drugs. (R2. 42.) Officer Bellanca stated that he told Robinson that he would "receive credit for substantial assistance," but that he never told Robinson what form the "credit" would take. (R2. 42.) In addition, Officer Bellanca said that he never told Robinson that the charge against him would be dropped or reduced and that he did not indicate what sentence Robinson would receive in exchange for his cooperation.
Officer Bellanca then reduced the "cooperation" agreement to writing on a form provided by the MADET, entitled "Multi-Agency Drug Enforcement Team Cooperating Individual Agreement." (Supp. 3.) That agreement, which is contained in the record from Robinson's first appeal, stated that Robinson would provide "sufficient information" for arrests in five cases; that the cooperation by Robinson "cannot and will not be allowed unless and until the District Attorney for Jefferson County has agreed to allow it"; that "either the *Page 464 
District Attorney, law enforcement authorities involved, or [Robinson] can terminate any working relationship entered into pursuant to this request at any time"; and that "the District Attorney will neither agree to recommend to the sentencing court that any sentence imposed against [Robinson] be reduced or suspended, nor make such a recommendation unless and until he is convinced that the work or information [Robinson] suppl[ies] pursuant to this request has led to the arrests of persons who, in his opinion exclusively, are more heavily involved in drug dealing than [Robinson]." (Supp. 3.) The agreement did not state that Robinson would not be prosecuted on the present charge. The agreement was signed by Robinson and by Officer Bellanca, but was not signed, or approved, by the district attorney. The record from Robinson's first appeal also contains a letter dated March 5, 1998, on the letterhead of the assistant district attorney for the Bessemer Division of Jefferson County, stating, in part: "In the event Tony A. Robinson satisfactorily completes his assistance to the Bessemer Police Department, no formal charges will be brought against him in the trafficking case now being investigated." (Supp. 4.) The letter included a space for the signature of a representative of the Jefferson County district attorney's office, a representative of the Bessemer Police Department, and Robinson. However, the letter is signed only by Robinson. In addition, Officer Bellanca testified that he had never seen the letter before the pretrial hearing.
After executing the written "cooperation" agreement, Robinson told Officer Bellanca that, for the past six weeks, he had been receiving packages of marijuana similar to the one for which he was arrested and that he had received anywhere between 10 and 25 pounds per week. He stated that he sold the marijuana to approximately five people in the Birmingham area for approximately $700 to $750 per pound, and that he would then "wire what he owed to people in California," approximately $500 per pound, and keep what was left. (Second Supp. 14.) After giving his statement, Robinson was released. Officer Bellanca testified that Robinson told him the name of his source in California that night, but that when he was asked to come in for follow-up interviews, Robinson would not come in, and he stopped returning Officer Bellanca's telephone calls. According to Officer Bellanca, other than identifying his source in California and indicating that another UPS package was on its way from California and was due to arrive the following morning, Robinson did not participate in any investigations or any drug transactions with the MADET.
At the same pretrial hearing, Linda Hall, who was present when the agreement was entered into, testified as follows:
 "[Robinson's counsel]: When did your initial representation of Tony Robinson begin?
 "[Hall]: At the initial arrest of this case. When he was initially represented.
 "[Robinson's counsel]: And would that have been February of 1998?
"[Hall]: Correct.
 "[Robinson's counsel]: And you were his attorney; is that correct?
"[Hall]: Correct.
". . . .
 "[Robinson's counsel]: And after he was arrested, did he enter some kind of agreement to your knowledge with law enforcement?
"[Hall]: Yes, he did.
". . . .
 "[Robinson's counsel]: And would you briefly tell me what [the MADET] agreement provides for? *Page 465 
 "[Hall]: It in essence says Tony Robinson provides assistance to law enforcement concerning others involved in any type of trafficking, that with the [district attorney's] permission that there will be credit given for substantial assistance.
 "[Robinson's counsel]: So, this is not an agreement between the DA's office and Mr. Robinson, it's an agreement between the drug task force and Mr. Robinson; is that correct?
"[Hall]: That's correct.
". . . .
 "[Robinson's counsel]: So, the date on the original cooperation agreement is February 1998. A month later you have a March '98 document; is that correct?
"[Hall]: Right.
 "[Robinson's counsel]: The February document is between Robinson and the Multi-Agency Drug Task Force. The March document is from the DA's office; is that right?
"[Hall]: Right.
". . . .
 "[Robinson's counsel]: Is th[e letter] signed by Mr. Robinson?
"[Hall]: Yes, it is.
 "[Robinson's counsel]: I recognize that it is not signed by anybody else. Let me ask you this. Is there any — who did you get the document from?
"[Hall]: The district attorney's office in Bessemer.
 "[Robinson's counsel]: And did you request them to give you this document?
"[Hall]: Yes, I did.
 "[Robinson's counsel]: And do you recall the individual who gave you this document?
 "[Hall]: This has been over two years ago. . . . I don't recall his name.
". . . .
 "[Robinson's counsel]: So, you were given this document by the assistant district attorney who at the time was working for the Bessemer [Division of Jefferson County]; is that right?
 "[Hall]: Yes, I asked that the document be drawn up. It was drawn up by the district attorney's office and presented to the DA that I was specifically told to go to. That particular DA says Mr. Bellanca has never informed me of any Multi-Agency Task Force agreement. Therefore, until I talk to him I cannot sign this document.
 "[Robinson's counsel]: All right. So the DA we can't identify says he needed to get with Mr. Bellanca before he would actually sign the document.
"[Hall]: That's correct."
(R2. 69-74.) (Emphasis added.) On cross-examination, Hall stated that she understood that the MADET agreement signed by Robinson would have "no validity unless there is an agreement made by the district attorney's office." (R2. 83.) However, Hall also stated that, during the discussions leading to the agreement, Robinson was told that if he provided assistance "we [would] recommend that no charges be brought against you." (R2. 84.) Hall also testified that she was not aware that Robinson had failed to meet with the police when asked; that she was never contacted by the police regarding further cooperation by Robinson; and that she was never informed by the district attorney's office that Robinson had not provided any assistance to law enforcement.
At a second hearing on this issue, Robinson testified that Officer Bellanca had promised him that no charges would be brought against him for any information he provided to the police in conjunction with the "cooperation" agreement; that he provided assistance to the police on three consecutive days following the day he *Page 466 
executed the agreement; and that he understood that the agreement required him to provide information on five cases, but that he was never contacted by the police again and, therefore, did not provide information on the five cases.
Citing Ex parte Yarber, 437 So.2d 1330 (Ala. 1983), Robinson argues that the State should be required to comply with the alleged agreement not to prosecute him and that the indictment against him should be dismissed. He maintains that he cooperated fully with the police and that the State failed to prove at any of the pretrial hearings that he did not comply with his part of the agreement. In Ex parte Yarber, the Alabama Supreme Court stated:
 "Negotiated pleas . . . serve a valuable role in the criminal justice system. If the integrity of that role is to be maintained, certainty must prevail. The state need not enter into a plea agreement. . . . However, once the state chooses to make an agreement, it should not be allowed to repudiate that agreement with impunity."
437 So.2d at 1335.
In Madison v. State, 561 So.2d 1123 (Ala.Crim.App. 1990), a case factually similar to the present case, this Court distinguished Ex parteYarber on the ground that no agreement actually existed between the appellant and the State:
 "In the present case, the order of the trial court denying the appellant's motion does not specifically address the existence of a plea agreement. Rather, the court held that if an agreement did exist, it was not breached by the State. In this Court's opinion, however, the record clearly establishes that there was no such agreement.
 "In Cooper v. United States, 594 F.2d 12 (4th Cir. 1979), the Court set forth the conditions under which the government could not withdraw from a plea bargain agreement:
 "`Within this general constitutional framework of substantive due process, here given an added dimension by the necessary implication of the right to effective assistance of counsel, we conclude that the defendant's constitutional rights were here violated by the government's failure to honor its plea proposal. In so holding, we emphasize those factual elements most crucial to our finding of right and violation in order to confine our holding as narrowly as we may for decision. Here [1] the proposal was specific and unambiguous in form, and [2] was made without any reservation related to a superior's approval or otherwise; [3] its content was reasonable in context; [4] it was made by a prosecutor with apparent (and probably actual) authority at the time; [5] it was communicated promptly to the defendant so that no question of staleness was involved; [6] the defendant assented promptly and unequivocally to its terms, indicated his assent to his counsel, and was entitled so far as the record shows to assume that its communication to the government would consummate the plea agreement; defense counsel did in fact within a matter of a few hours communicate defendant's acceptance to the government, by sheer fortuity being told of the government's "withdrawal" before he could vocalize his client's "acceptance"; and finally, [7] the reason for the attempted withdrawal had nothing to do with extenuating circumstances affecting the government's or any public interest that were unknown when the proposal was extended. . . .'
"Id. at 19 (emphasis supplied [in Madison]). *Page 467 
 "Without addressing the existence of the remaining elements, it is clear to this Court that the `agreement' in the present case fails to satisfy elements (2) and (4) of the test established in Cooper, supra. Any understanding that may have existed in this case was between Corporals Bear and Carr and the appellant. The record is devoid of any evidence that the prosecutor consented to, or was even aware of, this `agreement.'"
561 So.2d at 1125-26.
Similarly, here, contrary to Robinson's contention, the record shows that there was no agreement by the district attorney's office not to prosecute him. Although the record indicates that Robinson entered into a "cooperation" agreement, that agreement was between Robinson and Officer Bellanca of the MADET and was subject to the approval of the district attorney's office. However, nothing in the record indicates that the district attorney's office consented to the agreement. The MADET agreement was never signed by the district attorney or by a representative of the district attorney. Robinson's own counsel testified that when she went to the district attorney's office in Bessemer and requested a letter indicating that the district attorney would not bring formal charges against Robinson if he cooperated in other cases, the assistant district attorney she spoke to told her that he knew nothing about the MADET agreement signed by Robinson and Officer Bellanca and that he could not agree to anything or sign the letter she had requested that he draft — and that he did, in fact, draft — until he spoke with Officer Bellanca. Neither the MADET agreement nor the letter drafted at Robinson's counsel's request contain the signature or approval of the district attorney. Because there was no agreement between Robinson and the district attorney's office, there was nothing the State could have breached and nothing that could have been enforced. Therefore, the trial court properly denied Robinson's request to enforce the alleged agreement and his request to dismiss the indictment against him.
 III.
Robinson also contends that the trial court erred in denying his motion to suppress[10] the statement he made to police because, he says, he made the statement only because he had been promised that no charges would be filed against him and that nothing he said would be used against him.
At the pretrial hearing on his motion, Robinson testified that he spoke with Officer Bellanca after his arrest, in the presence of his attorney, Linda Hall, and that he was told that if he cooperated and testified against his source in California and provided information in five other cases, no charges would be filed against him and nothing he said would be used against him. He stated that he signed a "cooperation" agreement with the MADET with respect to his cooperation and that he then made an incriminating statement to police, after which he was released. He stated that subsequent to his arrest he was willing to cooperate with the police, but that they never contacted him again.
At the pretrial hearing on Robinson's motion to enforce the alleged agreement between him and the State (see Part II of this opinion), which was held before the hearing on his motion to suppress, Robinson's attorney, Linda Hall, who was present during Robinson's questioning, testified that Robinson was told that "[a]ny information that you provide as it relates *Page 468 
to the present charges will not be used against you but will be used against the source out of California" (R2. 84), and that if he cooperated, "we [would] recommend that no charges be brought against you." (R2. 84.) However, as noted previously, Officer Bellanca testified that he told Robinson that he would "receive credit for substantial assistance," but that he never told Robinson what form the "credit" would take. (R2. 42.) In addition, Officer Bellanca said that he never told Robinson that the charge against him would be dropped or even reduced, nor did he indicate what sentence Robinson would receive in exchange for his cooperation.[11] At the conclusion of the suppression hearing, the trial court denied Robinson's motion to suppress, finding that his confession was voluntary.
We recognize that "[a] direct and substantial promise to drop other cases against the defendant is sufficient to require exclusion of a confession obtained by that promise." Rutledge v. State, 651 So.2d 1141,1144 (Ala.Crim.App. 1994). However, "[w]here the trial court finds on conflicting evidence that a confession was voluntarily made, such finding will not be disturbed on appeal unless it appears contrary to the great weight of evidence or is manifestly wrong." Burks v. State, 353 So.2d 539,542 (Ala.Crim.App. 1977).
 "`[C]onflicting evidence given at [a] suppression hearing presents a credibility choice for the trial court.' Atwell v. State, 594 So.2d 202, 212
(Ala.Cr.App. 1991), cert. denied, 594 So.2d 214 (Ala. 1992). '[A] trial court's ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, and is not to be reversed absent a clear abuse of discretion.' Jackson v. State, 589 So.2d 781, 784 (Ala.Cr.App. 1991) (citations omitted)."
Rutledge, 651 So.2d at 1144-45.
 "Although a promise of leniency or reward undermines the voluntariness of a confession, see Holmes v. State, 598 So.2d 24 (Ala.Cr.App. 1992); Campbell v. State, 574 So.2d 937 (Ala.Cr.App. 1990), when the evidence regarding whether a promise was made is in conflict, the trial court must make a credibility determination. `Absent clear error, the [circuit] court's credibility choices at suppression hearings are binding on this court.' Walker v. State, 551 So.2d 449, 451 (Ala.Cr.App. 1989). The standard on review of conflicting evidence at a motion to suppress a confession is whether the *Page 469 
trial court's finding was `manifestly contrary to the great weight of the evidence.' Ex parte Matthews, 601 So.2d 52 (Ala. 1992), cert. denied, [505] U.S. [1206], 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992). See also Ex parte Singleton, 465 So.2d 443, 445 (Ala. 1985) (whether the finding was `palpably contrary to the weight of the evidence')."
Thompson v. State, 611 So.2d 476, 478 (Ala.Crim.App. 1992).
 "Moreover, we note that the mere promise to make cooperation known to law enforcement authorities, as opposed to a direct promise of a reduced sentence, generally is not considered an illegal inducement. In United States v. Nash, 910 F.2d 749, 752-53 (11th Cir. 1990), the United States Court of Appeals for the Eleventh Circuit held:
 "`We find that the district court was not clearly erroneous in accepting [the officer's] testimony that he only promised to make [the defendant's] cooperation known to the United States Attorney's office and gave no guarantee of a reduced sentence. Although [the officer] told [the defendant] that cooperating defendants generally "fared better time-wise," this statement did not amount to an illegal inducement: "telling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government."'
 "(Quoting United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir. 1978)). Accord United States v. Levy, 955 F.2d 1098, 1105 (7th Cir. 1992) (holding that federal agent's indication to defendant that his cooperation would be reported to the United States Attorney did not make defendant's confession involuntary); United States v. Meirovitz, 918 F.2d 1376, 1380 (8th Cir. 1990) (holding that confession was voluntary although agents had promised to inform prosecutor of defendant's cooperation); United States v. Guerrero, 847 F.2d 1363 (9th Cir. 1988) (holding that agent's promise to inform prosecutor of defendant's cooperation does not render a subsequent confession involuntary); United States v. Baldacchino, 762 F.2d 170, 179 (1st Cir. 1985) (holding that an officer's promise to bring defendant's cooperation to the attention of the prosecutor did not make confession involuntary)."
McLeod v. State, 718 So.2d 727, 730-31 n. 4 (Ala. 1998).
Here, although it was undisputed that Officer Bellanca offered Robinson "credit" in return for Robinson's cooperation, the evidence was disputed as to whether there were any specific promises as to the form the "credit" would take. Officer Bellanca testified that no promises were made as to what "credit" Robinson would receive for his cooperation; Robinson testified that he was promised that no charges would be filed against him in the present case. Based on the conflicting evidence, we cannot say that the trial court erred in denying Robinson's motion to suppress his confession. See, e.g., Williams v. State, 795 So.2d 753
(Ala.Crim.App. 1999), aff'd, 795 So.2d 785 (Ala. 2001), and Davis v.State, 728 So.2d 192 (Ala.Crim.App. 1997).
 IV.
Fourth, Robinson contends that the trial court erred in denying his motion to dismiss the indictment on the ground that the evidence presented to the grand jury was insufficient to support the indictment.
 "`"When it appears that witnesses were examined by the grand jury, or *Page 470 
that the grand jury had before them documentary evidence, no inquiry into the sufficiency of the evidence is indulged." Loyd v. State, 279 Ala. 447, 448, 186 So.2d 731 (1966).'
"Coral v. State, 551 So.2d 1181, 1182 (Ala.Cr.App. 1989)."
Tomlin v. State, 695 So.2d 157, 164 (Ala.Crim.App. 1996). The indictment shows that two witnesses, Officer Bellanca and forensic scientist Greg Risch, testified before the grand jury. (C. 3.) Therefore, no inquiry into the sufficiency of the evidence is permitted. The trial court did not err in denying Robinson's motion to dismiss.
We note that Robinson also contends that the trial court erred in denying his request for discovery of the grand jury proceedings. However, Robinson did not expressly reserve the right to appeal this claim when he entered his guilty plea. Therefore, this claim is not properly before this Court for review.
Moreover, even if this claim were properly before this Court for review, it has no merit. It appears that Robinson requested discovery for the purpose of proving that the evidence was insufficient to sustain the indictment. However, because inquiry into the sufficiency of the evidence presented at the grand jury proceedings is not proper in light of the indictment affirmatively showing that two witnesses testified before the grand jury, discovery of the grand jury proceedings for this purpose was likewise not proper. In addition, we note that at one of the pretrial hearings on this issue, one of Robinson's counsel stated that he had been told by the prosecutor that the grand jury proceedings had not been recorded. In addressing an identical issue in Steward v. State,55 Ala. App. 238, 314 So.2d 313 (Ala.Crim.App. 1975), this Court stated:
 "The right to examine the grand jury testimony has been settled in the Alabama Courts, where it has been held a motion to require the State to produce testimony presented to the grand jury which returned an indictment was properly denied where the testimony was not preserved in writing and was not available. Sparks v. State, 46 Ala. App. 357, 242 So.2d 403
[(1970)].
 "There is no law requiring the recording of testimony before a grand jury in Alabama. The long time rule, sanctioned by our courts, is that the proceedings before a grand jury are essentially secret. This matter is thoroughly elucidated in the recent case of State ex rel. Baxley v. Strawbridge, 52 Ala. App. 685, 296 So.2d 779 [(1974)], in an opinion by Presiding Judge Cates of this court.
 "No transcription or other record of the grand jury proceedings was kept in the instant case.
". . . .
 "This motion was, therefore, properly overruled by the court."
55 Ala. App. at 240-41, 314 So.2d at 315. See also Stallworth v. State, [Ms. CR-98-0366, September 28, 2001] ___ So.2d ___ (Ala.Crim.App. 2001), and Hardy v. State, 804 So.2d 247 (Ala.Crim.App. 1999), aff'd,804 So.2d 298 (Ala. 2000). Because the record indicates that the grand jury proceedings were not recorded, there was clearly no error in the trial court's denying Robinson's motion for discovery of the grand jury proceedings.
 V.
Next, Robinson contends that the trial court should have suppressed the marijuana evidence because, he says, the State failed to prove the chain of custody of that evidence.
The record indicates that Robinson requested written documentation of the *Page 471 
chain of custody of the marijuana. At one of the pretrial hearings, Robinson indicated to the court that the State had not provided such documentation. In response, the prosecutor stated that he did not know whether such a document existed, but that, if it did, it had been produced with all of the other discovery materials. The following then occurred:
 "[Robinson's counsel]: If there is not a chain of custody of handling of these narcotics, then we file a motion to dismiss this case against my client.
 "THE COURT: I think that would probably be a proper motion to make at the proper time. I think it's a little premature at this time.
 "[Robinson's counsel]: Yes, sir, Judge. Are we to understand that the district attorney does not have a chain of custody. Mike Bellanca does not have a chain of custody.
". . . .
 "THE COURT: If I understand correctly, [the prosecutor] is saying he doesn't at this time.
 "[Prosecutor]: Judge, I'm saying if there is a piece of paper that says A gave it to B gave it to C gave it to D, in that format, then they have it. If no piece of paper in that format exists, then they don't have it. That doesn't mean there is no evidence of a chain of custody. That is absurd to suggest that.
 "[Robinson's counsel]: Is there written evidence of a chain of custody?
"[Prosecutor]: If you have it, it exists."
(R2. 270-71.) At Robinson's original guilty-plea proceedings, on February 13, 2001, after he had pleaded guilty, Robinson again raised the issue of the documentation for the chain of custody. The following exchange occurred:
 "[Robinson's counsel]: Our final request for purposes of preserving this for appeal, we raised . . . last Friday, as to whether or not there was an official chain of custody and paper. Of course, the district attorney had until eleven o'clock to produce that and he didn't produce that. And we would say the State doesn't have a case.
 "THE COURT: And correct me if I'm wrong. The question of the motion was to produce a written memorandum as to the chain of custody, not to provide testimony as to the chain of custody, but to produce a memorandum. And I denied that motion . . . ."
(R2. 299.) (Emphasis added.)
The only issue Robinson raised in the trial court was the State's failure to produce a document detailing the chain of custody of the marijuana evidence. Robinson never requested that the State present testimony as to its chain of custody, and he never moved to suppress the marijuana evidence; in fact, other than a cursory motion to dismiss, Robinson never even alleged, as he now does on appeal, that there was no chain of custody. Although Robinson expressly reserved the right to appeal the issue whether the chain of custody was proven at the time he entered his guilty plea, the record reflects that Robinson never moved to suppress the marijuana evidence on the ground that the State failed to prove the chain of custody before he entered his plea. Robinson cannot expressly reserve the right to appeal a pretrial issue that was, in fact, never presented to the trial court before trial.
Consequently, the issue now presented by Robinson is not properly before this Court for review. "An issue raised for the first time on appeal is not subject to appellate review because it has not been properly preserved and presented." Pate v. State, 601 So.2d 210, 213 *Page 472 
(Ala.Crim.App. 1992). Furthermore, "[t]he statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial." Ex parte Frith,526 So.2d 880, 882 (Ala. 1987). Whether the marijuana evidence should have been suppressed because there was no chain of custody is not properly before this Court for review.
 VI.
Finally, Robinson contends that he was denied equal protection of the law when the State failed to offer him the same plea bargain that it offered to his codefendant, Calvin Parker. Specifically, Robinson argues that he was offered a 10-year sentence, which was split so that he would serve 3 years, while Parker was offered a 10-year sentence, which was split so that he would serve only 1 year, and that "this disparity of sentences was the product of vindictiveness on the part of the state" due to his pretrial attempts to have the charge against him dismissed. (Robinson's brief at p. 19.)
The record reveals that Robinson orally raised this issue during the pretrial hearing on his written motion requesting the State to reveal any deals, promises, or inducements offered to witnesses. When the State indicated that it had offered Parker a 10-year sentence, which had been split so that Parker would serve 1 year, Robinson argued that, under the Equal Protection Clause, the prosecutor must offer him the same deal it had offered Parker. In response, the trial court told Robinson that the equal-protection issue was not a part of the written motion currently before the court, and would not be considered, but that he could file an additional motion at a later time if he so chose. Specifically, the court said that it would "give [Robinson] leave to file the additional motion that [he] mentioned relative to the equity . . . about the . . . offer of sentencing." (R2. 258-59.) The trial court never ruled on Robinson's oral request, and the record reflects that Robinson did not file any additional written motion as to this issue. However, at the conclusion of the first guilty-plea proceeding on February 13, 2001, Robinson again orally asserted that he had been denied equal protection of the laws when the State did not offer him the same plea bargain it had offered Parker; this time, the trial court expressly denied the motion.
"The basic tenet of the equal protection clause is not that all persons must be treated equally, but rather that all persons similarly situated
must be treated equally." Smith v. State, 518 So.2d 174, 176
(Ala.Crim.App. 1987). "`[S]eparate treatment of defendants does not violate any constitutional guarantee of equal protection so long as that treatment is reasonable and founded on a rational basis.'" Carroll v.State, 599 So.2d 1243, 1244 (Ala.Crim.App. 1992), quoting Wheatt v.State, 410 So.2d 479, 484 (Ala.Crim.App. 1982). "`[A] defendant who alleges an equal protection violation has the burden of proving "the existence of purposeful discrimination."'" Facion v.State, 627 So.2d 1144, 1145 (Ala.Crim.App. 1993), quoting McCleskey v.Kemp, 481 U.S. 279, 292 (1987). Robinson's equal-protection argument is six sentences in length, and the only case Robinson cites deals with due process, not equal protection. Other than a bare allegation of prosecutorial "vindictiveness," Robinson has not shown the existence of purposeful discrimination by the prosecutor, and he has not even alleged, much less shown, that he and Parker were similarly situated, and the record clearly shows they were not. Therefore, Robinson has failed to demonstrate an equal-protection violation. *Page 473 
Based on the foregoing, the judgment of the trial court is affirmed.
OPINION OF OCTOBER 25, 2002, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.
[1] These facts are taken from the testimony and argument at the various hearings on Robinson's pretrial motions, transcripts of which are contained in the record from Robinson's first appeal, and from the testimony taken at a forfeiture hearing, a transcript of which is also contained in the record from Robinson's first appeal, and upon which Robinson relied heavily in arguing many of his pretrial motions. See, e.g., Nettles v. State, 731 So.2d 626 (Ala.Crim.App. 1998) (recognizing that this Court may take judicial notice of its own records).
[2] References to the record on appeal in the present case, will be designated as "R." and "C." References to the record from Robinson's first appeal will be designated as follows: "C2."; "R2."; "Supp."; and "Second Supp."
[3] The record reflects that the number on the page was a cellular telephone registered to a female living in Fairfield; however, the telephone was found on Robinson's person when he was arrested.
[4] Robinson orally moved to dismiss the indictment on this ground during the hearing on one of his written pretrial motions. It also appears from the record that Robinson subsequently filed a written motion to dismiss on the same ground; however, that motion is not contained in either the record in the present case or the record from Robinson's first appeal.
[5] Robinson also argues that venue was not proper in the Bessemer Division because, he says, "[t]here is no evidence that the drugs were to be distributed in the" Bessemer Division. (Robinson's brief at p. 8.) We hasten to point out, however, that Robinson was not charged with, nor did he plead guilty to, distribution, and that distribution of the marijuana was not an element of either the crime with which he was charged (trafficking) or the crime to which he pleaded guilty (possession). Therefore, where the marijuana was ultimately to be distributed is irrelevant to this issue.
[6] The two divisions of Jefferson County are treated as two separate counties for purposes of venue. See Ex parte Jackson, 516 So.2d 768
(Ala. 1986), and Agee v. State, 465 So.2d 1196 (Ala.Crim.App. 1984).
[7] Robinson did challenge the factual basis when he originally pleaded guilty on February 13, 2001; however, he did not do so the second time he pleaded guilty.
[8] See Miranda v. Arizona, 384 U.S. 436 (1966).
[9] Robinson testified at the pretrial hearing on his motion to suppress his statement (see Part III of this opinion) that he was never advised of his Miranda rights.
[10] Robinson actually styled his motion as a motion in limine.
[11] In Ex parte Price, 725 So.2d 1063 (Ala. 1998), the Alabama Supreme Court stated:
 "Price has cited no legal authority or persuasive reason in support of a rule requiring this Court to consider only the evidence presented to the trial court at the pretrial suppression hearing. Accordingly, we will apply the long-standing rule that, in considering whether the trial court properly overruled a defendant's motion to suppress an extrajudicial confession or other inculpatory statement, a reviewing court may consider both the evidence presented at the pretrial suppression hearing and the evidence presented at trial. See, e.g., Henry v. State, 468 So.2d 896, 899 (Ala.Crim.App. 1984); United States v. Smith, 527 F.2d 692, 694 (10th Cir. 1975) (`In passing on the correctness of the trial court's denial of [the defendant's] motion to suppress, we are not limited to a consideration of just the evidence introduced at the hearing on the motion to suppress. In addition thereto, we may also consider the evidence adduced at trial, even though such may not have been presented at the pretrial suppression hearing.')."
725 So.2d at 1067-68 (footnote omitted). If an appellate court can consider evidence presented after the hearing on a pretrial motion to suppress a confession, i.e., evidence presented at trial, in determining whether a confession was voluntary, it is logical that we may also consider evidence presented before the hearing on the pretrial motion to suppress, i.e., evidence presented at another pretrial hearing.